UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH ELECTRIC
COMPANY D/B/A NSTAR ELECTRIC,

                  Plaintiff,

vs.

THE OKONITE COMPANY,

                  Defendant.

Civil Action No. 04-cv-11681-RCL

## THE OKONITE COMPANY'S MEMORANDUM IN SUPPORT OF
## ITS MOTION FOR SUMMARY JUDGMENT

### Introduction

This case concerns a submarine (undersea) cable that runs from Falmouth to Martha's
Vineyard.  Defendant The Okonite Company ("Okonite") manufactured and installed this cable
for Commonwealth Electric Company d/b/a NStar Electric ("NStar") in 1996.  Over the eight-
plus years since the cable was put into service, it has been operational the vast majority of the
time.  The cable has, however, required replacement of three of its original fourteen splices and
one of the replacement splices.  Each time replacement was required, Okonite was responsive
and willingly, at no charge to NStar and pursuant to the parties' contract, replaced the splices
such that the cable continues to carry the electricity it was intended to carry.  With the cable's
original ten-year warranty nearing its end, NStar seeks to convert these contractually anticipated
replacements into unsupported claims for a new, free submarine cable, along with a new ten-year
warranty, despite the existence of exclusive remedy and limitation of liability provisions in the
parties' negotiated contract, despite the fact that it has gotten years of use from the cable, and

despite the fact, as indicated in its responses to interrogatories, that NStar currently has no factual basis for its claims that the cable's quality has been diminished.[1]

In making its demands, NStar ignores the careful allocation of economic risk that these sophisticated commercial parties negotiated concerning repairs to the cable.  Understanding that the cable might not work at times, for whatever reason, both parties agreed in their contract to allocate responsibility and risk such that Okonite would repair or replace any defects in the cable at its expense for the first ten years and NStar would be limited to that remedy.  There is no dispute that Okonite has honored its obligations: it has replaced the splices each time one experienced a failure, despite inconclusive evidence concerning the cause of the failure, at a cost to itself of more than NStar paid for the cable.  As such, this Court should not permit NStar now to renegotiate through litigation the agreement of these sophisticated businesses.

More specifically, this Court should grant summary judgment to Okonite because (1) NStar's contract and breach of warranty claims must fail because the contract contains an exclusive remedy provision, which Okonite has honored, and the cable works and has worked as intended for the vast majority of its lifetime, (2) NStar's negligent misrepresentation and fraud claims must fail because NStar cannot prove that the statements upon which is claim is based are false, NStar cannot show it reasonably relied on those statements, NStar has suffered no damages as a result of any alleged reliance since the cable has worked the vast majority of time and Okonite has satisfied its warranty obligations on the few occasions when it has not, and the statute of limitations has run on these claims, and (3) NStar's 93A claim must fail because this case involves nothing more than a garden variety contract dispute between two highly

---

[1] Specifically, in its response to each interrogatory asking it to state the factual basis of its allegations of diminution of the Cable, which it is required to have before filing its complaint, NStar provided absolutely no factual basis. *See, e.g.,* NStar's Responses to Okonite's Interrogatories, Responses Nos. 21,  22, 23, 24, 25,  26; *see also* Responses Nos. 5, 15, 17 (likewise offering no factual basis for allegation of defect). Exh. H. (Citations to "Exh." refer to exhibits attached to the Affidavit of Andrea C. Kramer, filed concurrently with this Memorandum.)

sophisticated commercial entities and because the damages limitation provision in the contract bars the claim.[2]

## Background

These sophisticated businesses have long histories, both in dealing with each other and in their industries. NStar has supplied electricity to Martha's Vineyard for many years, and Okonite, an employee-owned manufacturer of insulated electric wire and cable, has manufactured both land and submarine cables for decades. Okonite and NStar first collaborated on a submarine cable from Cape Cod to Martha's Vineyard in 1983. Fitzgerald Aff. at ¶3.[3]

In February 1995, NStar and Okonite executed a contract (the "Contract") for the purchase and installation of a submarine, land, and optical fiber cable system connecting Falmouth and Martha's Vineyard in Massachusetts at a price of approximately $3.1 million.[4] Exh A; Complaint at ¶11. This system included a 38,000-foot submarine cable that runs along the bottom of the turbulent Nantucket Sound. Fitzgerald Aff. at ¶18; Complaint at ¶11.

The parties carefully negotiated the terms of the Contract, including the length and extent of the warranty. NStar originally requested a ten-year warranty in its 1994 Request for Proposal, Exh. B, at OK00065, which Okonite offered in its Proposal, Exh. C, at OK00106.

---

[2]    Although the Motion for Summary Judgment is being filed early in this case, Okonite believes that much expense will be saved by addressing the issues at this time. Pursuant to this Court's pretrial order, the parties can take up to 26 depositions between them (none of which have been noticed yet), plus there will be thousands of pages of documents produced, and the parties are going to need to engage various experts. Thus, this will be an expensive case to litigate. Furthermore, further discovery will not provide any relevant facts. Regardless of whether the splices failures were caused by defect, which is the crux of NStar's discovery, Okonite has undeniably honored its warranty, and the exclusive remedy provision, and the Cable has worked the vast majority of time, and any claims that the cable may not last forty years not only have no legal basis, but they are premature.

[3]    "Fitzgerald Aff." refers to the Affidavit of James Fitzgerald, filed with concurrently with this Memorandum.

[4]    As originally executed, the Contract was between Okonite and the Commonwealth Electric Company. Exh. A. Commonwealth Electric Co. merged with Boston Edison Co. in 1999 and formed NStar as a holding company. NStar operates through its subsidiaries, of which Commonwealth Electric Co. is one. The Commonwealth Electric Company currently conducts its business under the name NStar Electric. Complaint, ¶2.

During negotiation of the Contract, NStar expanded its request to a warranty for forty years.

Exh. D.   Okonite rejected this request, Exh. A, D, and, ultimately, the parties agreed on a ten-

year warranty, an exclusive remedy provision, and a limited liability clause as the proper means

of allocating risk between them.  Exh. A, Section 2, § 11.0(N), at OK00285-86.  The exclusive

remedy provision of the Contract states that

> [Okonite's] sole responsibility under this Warranty shall be to repair or
> replace any defects within the System due to material and workmanship,
> without charge to the Company.  In the event of either repair or
> replacement of the defective System under this Warranty, [Okonite] shall
> be responsible for all costs associated therewith, including if necessary
> marine equipment, labor and materials.

Id.  The limitation of liability provision states that "[Okonite] will not be responsible for any

incidental or consequential damages whatsoever, either direct or indirect, resulting from a failure

of the System."  Id. at OK00286.  The Contract further set forth a detailed procedure in case any

part of the system, including the submarine cable, experienced any breakdowns.  Id. at § 11.0(P),

at OK00287-88.

NStar has, in fact, called upon Okonite's warranty.  Following execution of the Contract,

Okonite manufactured a submarine cable, pursuant to the Contract.  Fitzgerald Aff. at ¶12;

Complaint at ¶14.  That cable, laid in 1995, did not perform as warranted, for reasons that are not

relevant to this case, see Fitzgerald Aff. at ¶14, and Okonite readily replaced it, at no charge to

NStar, with a brand new cable (the "Cable"), which was energized in December 1996.

Complaint, ¶¶ 14, 15; Fitzgerald Aff. at ¶¶14-17.  The parties agreed to apply the Contract, along

with its full ten-year warranty, to the Cable.  Exh. E; Fitzgerald Aff. at ¶15.[5]

---

[5]       NStar continues to use the original cable to the present, though without a warranty and at lower amperage
than the original specification.  Fitzgerald Aff. at ¶16.

4

Since the Cable was energized in December 1996, three of the fourteen original splices on the Cable have experienced a failure in the transition zone between the splice and the Cable itself, and one of the splice replacements failed in the splice box. Fitzgerald Aff. at ¶¶20, 23, 31; Complaint at ¶17.[6] Each time a splice has had to be replaced, NStar called on Okonite, and each time Okonite promptly replaced the failed splice or splice box, as well as surrounding splices, at no charge to NStar,[7] even though the cause of the failures has never been determined. Fitzgerald Aff. at ¶¶24, 25. Overall, in the eight years the Cable has been carrying current to Martha's Vineyard, it has operated as intended over 91% of the time.[8]

**Argument**

I.    **NStar's Claims for Breach of Contract and Breach of Warranty (Counts I, II, III, IV, and VII) Fail Because Okonite Has Replaced Every Splice That Experienced a Failure and The Cable Is Fully Functioning.**

The UCC, which governs the Contract, provides that parties to a sales agreement can limit the buyer's remedy, such as by permitting only repair or replacement, "except that where circumstances cause an exclusive or limited remedy to fail of its essential purpose, the buyer can seek any remedy provided for in the UCC." Mass. Gen. L. ch. 106, § 2-719. Thus, where a contract contains an exclusive remedy provision, the buyer is limited to that remedy unless the remedy provision itself fails of its essential purpose. The essential purpose of an exclusive remedy provision is "to provide the seller an opportunity to tender conforming goods and thereby

---

[6]    It is important to distinguish, as NStar fails to do, between the breakdowns in the Cable and the design problems in the original cable. These breakdowns occurred only in the splices and do not indicate any problems in the Cable itself, and unlike the problems in the original cable, they are remediable and were remedied completely.

[7]    Altogether, the out-of-pocket costs costs (i.e. the amounts paid to outside vendors, not including the costs of Okonite's own personnel and the materials used to manufacture the replacement segments of cable) have exceeded the original purchase price of the cable. Fitzgerald Aff. at ¶32.

[8]    During the times that the Cable has not been operational due to a splice failure, NStar has continued to provide electricity to Martha's Vineyard through various other means, such that only a limited number of customers experienced any disruption, and in those cases, the disruption was short, i.e. no more than an hour and a half and as little as a 35 minutes. Exh. F, Response to No. 18.

5

limit his exposure to risk for other damages, while simultaneously providing the purchaser with the benefit of his bargain – i.e. conforming goods." *Myrtle Beach Pipeline Corp. v. Emerson Electric Co.*, 843 F. Supp. 1027, 1042 (D.S.C. 1993). As such, an exclusive remedy provision fails of its essential purpose only when it deprives the buyer of minimum adequate remedies. *See Boston Helicopter Charter, Inc. v. Agusta Aviation Corp.*, 767 F. Supp. 363, 373 (D. Mass.1991); *see also* Mass. Gen. L. ch. 106, § 2-719, Comment 1.

Importantly, a product failure by itself ***does not*** cause a exclusive remedy provision to fail of its essential purposes. *See, e.g., Tacoma Boatbuilding Co. v. Delta Fishing Co.,* 28 U.C.C. Rep. Serv. 26, n. 10 (W.D. Wash.1980)(cited in *Mercury Marine v. Clear Water Construction Co., Inc.*, 839 So.2d 508 (Miss. 2003)("Since the repair remedy by definition anticipates some failure, this alone could not frustrate the remedy's purpose.")); *see also Riegel Power Corp. v. Voith Hydro,* 888 F.2d 1043, 1046 (4th Cir. 1989)(granting summary judgment and holding that repair-or-replacement clause did not fail of its essential purposes, as a matter of law, despite fact that electric turbine failed five times in short period of time). To the contrary, where an exclusive remedy provision includes repair as an option, as in this case, the buyer must afford the seller an opportunity to cure the claimed defects; thus, product failure alone cannot constitute failure of the essential purpose of the remedy provision. *Abele v. Bayliner Marine Corp.*, 11 F. Supp. 2d 955, 960-961 (N.D. Ohio 1997). In fact, the seller usually is allowed more than just one opportunity to repair. *See, e.g., Rester v. Morrow,* 491 So.2d 204, 210 (Miss. 1988); *Mercury Marine v. Clear Water Construction Co., Inc.*, 839 So.2d 508 (Miss. 2003). This is especially true where both parties to the contract are commercial entities accustomed to allocating risk.

Indeed, the fact that the exclusive remedy provision in this case is contained in a carefully negotiated contract between two commercial entities is highly significant to the legal determination of whether the exclusive remedy provision failed of its essential purpose.  In a transaction involving sophisticated parties, one of the paramount purposes of the UCC is to enable the parties to control their own relationships and allocation of risk.  *Sparta Food, Inc. v. Rupari Food Services, Inc.*, 2003 WL 22047865, *4 (D. Minn. 2003).  As the Supreme Court explained:

> [T]he law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements.  The manufacturer can restrict its liability, within limits, by disclaiming warranties or limiting remedies.  In exchange, the purchaser pays less for the product.  Since a commercial situation generally does not involve large disparities in bargaining power, we see no reason to intrude into the parties' allocation of the risk.

*East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 872-873 (1986)(citations omitted).  Echoing this idea, one court, in upholding summary judgment against the plaintiff in a breach of warranty case over plaintiff's claim that the exclusive remedy failed of its essential purpose, explained: "With the bargained for purchase agreement, [the parties] allocated between themselves all risks of loss arising from defects in the [product] and its components.  That allocation would be nullified if [the plaintiff] were able to recover against [the defendant]." *Airlift Intern., Inc. v. McDonnell Douglas Corp.*, 685 F.2d 267, 270 (9th Cir. 1982).  Similarly, another court held that the exclusive remedy provisions in a commercial contract did not, as a matter of law, fail of their essential purposes, based on its reasoning that "[u]nderstanding this commercial context cannot be divorced from the concept of limited remedies…. Because the parties entered into this contract on an equal footing, the court should enforce it according to its terms…. Here, the risk was allocated to [the plaintiff] by the express terms of the contract that the parties executed.  Had [the plaintiff] not desired to bear this risk, it had ample opportunity to

shift the risk to [the defendant] or to disavow the contract, but it did neither; so it cannot now complain." *Myrtle Beach Pipeline Corp.*, 843 F. Supp. 1027.  Accordingly, and importantly, courts have repeatedly held in the context of sophisticated commercial parties and transactions like the one in this case that where a seller has repaired a product within a commercially reasonable time each time it has failed and the product works as intended after repair, the exclusive remedy provision does not fail as a matter of law.  *See, e.g., Chatlos Sys., Inc. v. National Cash Register Corp.,* 635 F.2d 1081, 1085 (3d Cir. 1980)("[w]hen presented with the question whether an exclusive repair remedy fails of its essential purpose, courts generally have concluded that so long as the buyer has use of substantially defect-free goods, the limited remedy should be given effect."); *Transport Corp. of Am., Inc. v. International Bus. Machs. Corp., Inc.,* 30 F.3d 953, 959 (8th Cir. 1994)("A repair or replace clause does not fail of its essential purpose so long as repairs are made each time a defect arises.").

In general, an exclusive remedy provision that limits the buyer's remedies to repair or replacement of a defective product, like the one in this case, fails of its essential purpose only in situations where the seller is unable or unwilling to make repairs within a reasonable time or where despite repeated repairs the product never works. *See, e.g., Chatlos Sys.,* 635 F.2d at 1085 (limited remedy provision failed of essential purpose where computer was never fully operational after a year-and-a-half of repairs); *Fargo Mach. & Tool Co. v. Kearney & Trecker Corp.*, 428 F. Supp. 364, 381 (E.D. Mich. 1977)(limited remedy provision failed of essential purpose where metal machining equipment still did not work properly after thirty-seven repairs); *Bishop Logging Co. v. John Deere Indus. Equipment Co.*, 317 S.C. 520, 533 (App. Ct. 1995)(limited remedy provision failed of essential purpose where logging equipment never worked properly despite numerous repairs); *Riegel Power Corp. v. Voith Hydro,* 888 F.2d 1043,

1046 (4th Cir.1989)(limited remedy provision did not fail of its essential purpose where defendant repaired repeated failures in electric turbine because "[g]enerally, in the commercial cases, the 'essential purpose' exclusion arises only where the seller has refused to make repairs as he was required or where he cannot repair the product").  This is not the situation in this case: Okonite willingly and promptly made repairs, and the Cable works as warranted with the repairs.

In this case two experienced, sophisticated commercial parties freely negotiated the Contract, and in so doing, they decided on a specific allocation of risk: Okonite would bear the risk of the cost of potential repairs or replacements due to defects for ten years and NStar would bear the risk that the Cable might be out of service sometime.  Okonite bore its risk: it replaced the original cable with a wholly new cable when its defects appeared to be irremediable, and it remedied all failures in the splices or splice repairs in the Cable at no charge to NStar, despite the lack of a determination that the failures were due to defect.  As a result, the Cable has been fully operational for over 91% of its life, and it shows no signs that it will not continue to work for the remainder of the ten-year warranty period.  To borrow the words of one court, "[g]iven this conclusion, it is beyond cavil that the exclusive remedy these parties agreed to operated just as the parties contemplated." *New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp.,* 387 Pa. Super. 537, 549 (1989).  Therefore, the exclusive remedy provision in the Contract cannot be found to have failed of its essential purpose, which is to afford Okonite an opportunity to repair any defects and to provide NStar with a Cable that works.

In an effort to avoid this result, NStar baldly claims that it is nevertheless entitled to a wholly new cable with a new, full ten-year warranty, despite its more than eight years of use of the Cable, because the testing done to locate the faults in the Cable and to check the repairs afterward have allegedly diminished the life of the Cable, which NStar now claims should be

forty years.  Complaint, ¶¶ 1, 20, 21.  Even if this claims were supported by any analysis done on the Cable after repair, which it is not, the exclusive remedy provision still does not fail of its essential purpose because Okonite never promised, warranted, or contracted to provide a cable that would last more than ten years.[9]  That NStar now alleges – in stark contrast to the express language of the parties' freely negotiated Contract – that it "expected" the Cable to last forty years is, therefore, nothing more than an attempt by NStar to renegotiate the Contract and reallocate the risks.  During negotiation, NStar sought a forty-year warranty and did not get one.  As such, acceptance of NStar's claims that the repairs themselves diminished the Cable basically would give NStar the forty-year warranty it could not get during negotiation.  NStar's bald claims that the repairs themselves (i.e. the replacement of factory splices with field splices) diminished the Cable likewise is an attempt to renegotiate the clear terms of the Contract because acceptance of those claims would essentially render meaningless the repair option in the warranty, and the accompanying detailed repair procedure, Exh. A., Section 2, § 11.0(P), at OK00287-88.

In sum, then, although a determination of whether an exclusive remedy provision fails of its essential purposes often is a question of fact for the jury, here the Court can decide as a matter of law that the provision did not fail of its essential purpose.  *See., e.g., Riegel Power Corp.* 888 F.2d at 1046 (affirming district court's summary judgment determination that the limited remedy had not failed of its essential purpose where, despite five failures in a few years, defendant repaired electric turbine, which then was fully operational); *New York State Elec. & Gas Corp.,*

---

[9]     Moreover, NStar's claim about the allegedly destructive nature of the testing is disingenuous and a clear ploy to extract a warranty it was not able to get during negotiation and to renegotiate the Contract after the fact.  NStar was not only fully aware at the time it entered the Contract of the type of testing that would be required in case of failure in the Cable, but NStar itself required that the manufacturer perform this type of testing during manufacture at much higher current, Exh. B at OK00015, and this type of testing is industry standard,  Fitzgerald Aff., ¶29.

387 Pa. Super. at 549 (affirming district court's summary judgment determination that the limited remedy had not failed of its essential purpose where seller performed any obligations it might have had for nonconforming services or products under the agreements by repairing electric generator, which functioned properly after first repair and since second repair); *Transport Corp. of Am., Inc.,* 30 F.3d at 959 (affirming district court's summary judgment determination that the limited remedy had not failed of its essential purpose where it was undisputed that seller made repair and that product then worked as intended, despite buyer's claim of latent defect).

In this case, there is no genuine issue that the Cable continues to work and that Okonite replaced each failed splice, as required by the Contract negotiated by these commercial entities. There is also no genuine issue that the Cable remains fully operational, and NStar does not, and cannot, contend that the Cable never or even rarely worked properly or fully. To the contrary, there is no genuine issue that the Cable continues to work and has been fully operational for the vast majority of time since it was energized. Fitzgerald Aff. at ¶31. As a matter of law, therefore, the limited warranty has not failed of its essential purpose, and NStar's claims that Okonite breached the Contract or its express or implied warranties must fail.

## II.    NStar Cannot Prove Its Fraud and Negligent Misrepresentation Claims (Counts V and VI), and They Are Barred By the Statute of Limitations.

To prove either negligent misrepresentation or fraud, NStar must show, at a minimum, that Okonite made a false statement, that NStar relied on that statement, and that NStar suffered damages as a result. *Equipment & Sys. for Indus., Inc. v. Northmeadows Constr. Co.,* 59 Mass. App. Ct. 931 (2003)(elements of fraud); *McEneaney v. Chestnut Hill Realty Corp.,* 38 Mass. App. Ct. 573, 575 (1995)(elements of negligent misrepresentation). NStar cannot do this because (a) it has no proof – and can have no proof – that the statements that it relies on for its

11

claims are false, (b) its reliance on those statements is not reasonable and NStar cannot show it actually relied on them, and (c) given that the Cable has worked as intended the vast majority of its life, NStar has not suffered any damages as a result of any alleged reliance on the Okonite's allegedly false statements.  Moreover, NStar's negligent misrepresentation and fraud claims are barred by the statute of limitations.  Overall, the nature of NStar's allegations in these claims highlight that they are nothing but an attempt by NStar to do an end-run around the limitations of its contract and warranty claims and the dictates of Chapter 93A.  *See generally  New York State Elec. & Gas Corp.*, 387 Pa. Super. at 551 (describing buyer's fraud claims in closely analogous case as being "aimed at eliminating the parties' agreements as a bar to recovery of the pleaded damages").

   **A.**  ***There is No Proof that Okonite's Statements are False.***

   The two statement that NStar has identified in its Complaint as the basis of its fraud and misrepresentation claims, per Rule 9(b) of the Federal Rules of Civil Procedure, are (1) "The Okonite [cable insulation] system has performed flawlessly in a multiplicity of applications and in various types of installations, i.e., submarine cables" and (2) "With over twenty-five years of service life experience in submarine applications, Okoguard provides a balance of properties that include reliability, flexibility, high ampacity rating and retained dielectric strength."  Complaint, ¶¶ 6, 44-53.  NStar cannot show, as it must, that these general statements about the quality of Okonite's product are false.

   To be clear, it is not enough for NStar to show, even if it could, that Okonite's cable insulation system (Okoguard) did not perform flawlessly in this case or that the Okoguard used in the Cable somehow did not provide a balance of the listed properties.  That evidence would be irrelevant to a determination of the truth of these statements, which are general advertising statements concerning the historic quality of Okoguard.  Rather, to prove its claims, NStar must

prove that Okonite's insulation system is *in general* not a good product. This it cannot do. Indeed, the submarine cable Okonite manufactured and installed for NStar in 1990, which has never failed and has worked flawlessley, Fitzgerald Aff. at ¶4, is conclusive evidence that Okonite's statements are true. That these general statements by Okonite, the only ones NStar identified in its Complaint, cannot be proven false is dispositive of NStar's negligent misrepresentation and fraud claims.

        **B.**     **_NStar Cannot Show It Reasonably Relied on The Alleged Statements._**

NStar cannot show reliance on these claims. The two statements upon which NStar claims to have relied were contained in advertising materials that accompanied Okonite's formal proposal to NStar in 1994. It is simply unreasonable for NStar, a sophisticated business entity that itself had extensive experience with Okonite's products (both land and underwater cables), to claim that it reasonably relied on a couple of sentences buried deep in advertising material sent with the Proposal. *Cf. Sierra Marketing, Inc. v. New England Wholesale*, 14 Mass. App. Ct. 976, 977(1982)(rejecting plaintiff's claim of fraud based on statement in advertising material where statement was roughly accurate).

        **C.**     **_NStar Has Not Suffered Any Damages._**

As explained above, the Cable has performed as intended the vast majority of the time since it was energized, the parties fully anticipated that the Cable might suffer breakdowns (as evidenced by the repair procedure in the Contract, <u>Exh. A</u>., Section 2, § 11.0(P), at OK00287-88), and the parties agreed that NStar's sole remedy would be for Okonite to repair or replace any defects, at no charge to NStar, within a ten-year period. Okonite has fully performed all its obligations under the Contract, and NStar has gotten what it contracted for, a functioning cable. As such, NStar has suffered no damages as a result of any allegedly false statements that Okonite has made.

   **D.**   **_The Statute of Limitations Has Run on NStar's Claims._**

The statute of limitations for either intentional or negligent misrepresentation is three years from the date the claim accrues.  Mass. Gen. L. ch. 260, § 2A.  Misrepresentation and fraud claims accrue at the time the plaintiff learns or reasonably should have learned of the falsity of the statement.  *Kent v. Dupree*, 13 Mass. App. Ct. 44, 47 (1982).  The plaintiff need not know the full extent of harm, only that it has suffered some cognizable harm.  *See, e.g., Bowen* v. *Eli Lilly & Co., Inc.,* 408 Mass. 204, 206 (1990); *Humana Foundation, Inc. v. Cantella & Co., Inc.*, 2000 WL 33774752, *5 (D. Mass. 2000)(and cases cited therein).  In this case, if, as NStar claims, it was injured because Okonite's statements concerning the quality and reliability of its insulation system were shown to be false by a failure in the Cable or one of the splices in the Cable, NStar knew or should have known of its injury, and thus its claims accrued, no later than when a splice first suffered a failure in August 1997, nearly seven years before NStar brought its claims in this case.  Based on NStar's own allegations, it had sufficient knowledge of the purported injury once the first splice needed to be repaired and the repairs and testing were undertaken.  Accordingly, NStar's misrepresentation and fraud claims are barred by the statute of limitations.[10]

**III.**   **NStar's 93A Claim (Count VIII) Fails Because The Conduct Complained Of Does Not, As a Matter of Law, Rise to the Level Required for Liability Under Chapter 93A.**

General Laws c. 93A makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. L. ch. 93A,

---

[10]      To the extent that NStar's 93A claim is based on these alleged misrepresentations by Okonite, it is likewise time-barred, for the same reason.  The statute of limitations for 93A claims is four years from the date the claim accrues.  Mass. Gen. L. ch. 260, § 5A.  93A claims accrue when the plaintiff suffers injury from the purported unfair or deceptive act or, if unknowable at that time, when the plaintiff knew or should have known it suffered injury. *Cambridge Plating Co., Inc. v. Napco, Inc*., 991 F.2d 21, 25 (1st Cir. 1993); *see also Fine v. Huygens, DiMella, Shaffer & Associates*, 57 Mass. App. Ct. 397 (2003)(accrual date for claim under 93A is determined by same principles that govern determination of underlying action); *Kozikowski v. Toll Bros.*, Inc., 246 F. Supp. 2d 93 (D. Mass. 2003)(same).  NStar filed its 93A claim more than four years after the first splice suffered a failure.  To the extent that NStar's 93A is based on the alleged breach of warranty or breach of contract, it may not be time-barred under this analysis but still must be dismissed for the reasons stated in the next section, i.e. that ordinary contract disputes between commercial entities are not cognizable under 93A.

14

§ 2(a).  The Massachusetts Supreme Judicial Court has defined "unfair or deceptive acts or practices" as those that are "within at least the penumbra of some common-law, statutory, or other established concept of unfairness; [or] (2) [are] immoral, unethical, oppressive, or unscrupulous; [and] (3) … cause[] substantial injury to consumers (or competitors or other businessmen)."  *See PMP Assoc., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975).  In addition, where the claim involves two commercial entities, as the claim in this case does, "the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce."  *Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979); *Quaker State Oil Refining Corp. v. Garrity Oil Co., Inc.*, 884 F.2d 1510, 1513 (1st Cir. 1989)(quoting *Levings*).

Neither a mere breach of contract nor a mere breach of warranty, without more, constitutes a 93A violation in the context of commercial entities.  *See, e.g., Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass. 85, 100-101 (1979)(dismissing 93A count that was based solely on allegation of breach of contract); *Chambers Stell Engraving Corp. v. Tambrands, Inc.*, 895 F.2d 858, 861 (1st Cir. 1990)("[t]he mere breach of a contract, without more, even if one existed, would not violate ch. 93A"); *JetPac Group, Ltd. v. Bostek, Inc.*, 942 F. Supp. 716, 720 (1996)("In this commercial context, the breach of the warranty of merchantability does not automatically amount to an unfair or deceptive trade practice, as it would in a consumer context."); *Canal Electric Co. v. Westinghouse*, 756 F. Supp. 620, 628 (D. Mass. 1990)(*Canal Electric II*)(mere breach of contract, in absence of showing of repudiation, willful dilatoriness, or failure to provide minimum adequate remedy in form contract, not a 93A violation).

Accordingly, even if the allegations in the Complaint were true, which they are not, Okonite's purported conduct does not rise to the level of a 93A violation.  Plaintiff's allegations

show unequivocally that at most there is an ordinary dispute over the terms of the Contract and whether Okonite has satisfied its obligations under the contract. Indeed, in Counts One, Two, Three, Four, and Seven, NStar alleges nothing more than straightforward breach of contract and breach of warranty. In Counts Five and Six, NStar adds the allegation that it relied to its detriment on the two general advertising statements discussed above. These claims do not change the basic case, however, because even if these statements were false, which they cannot be shown to be, NStar has suffered damage only if Okonite breached the Contract, *i.e.* if the Cable did not work as warranted and Okonite did not satisfy its obligation to repair or replace any defects.[11] As such, the dispute here is nothing more than a dispute regarding Okonite's contract obligations and the quality of the Cable. *See, e.g., Duclersaint v. Federal National Mortgage Assoc.*, 427 Mass. 809, 814-15 (1998) (no 93A violation where parties had a "genuine difference of opinion"); *see also Saint-Gobain Indus. Ceramics, Inc. v. Wellons, Inc.*, 246 F.3d 64, 73-75 (1st Cir. 2001).

The reasoning of the Appeals Court in a case in which it upheld the lower court's denial a 93A claim that was based solely on a contract dispute applies well in this case:

> [A]lthough the [plaintiff] had committed a breach of the noncompetition provision, it had not acted unfairly or deceptively, and it had not violated G.L. c 93A, § § 2 and 11. The [plaintiff] did not violate a provision of the lease to gain an economic advantage or to extort a concession. Compare *Anthony's Pier Four, Inc. v. HBC Assocs.,* 411 Mass. 451, 474, 476 (1991), with *Atkinson v. Rosenthal,* 33 Mass. App. Ct. 219, 226 (1992). There was no evidence that the [plaintiff] obtained any specific economic advantage from [the alleged breach]. The [plaintiff] and [defendant] had a genuine difference of opinion about the meaning of the "no other deli" clause. … This was an ordinary contract dispute without conduct that was unethical, immoral, oppressive, or unscrupulous. *Levings v. Forbes & Wallace, Inc.,* 8 Mass. App. Ct. 498, 504 (1979). Not every unlawful act is automatically an unfair or deceptive one. *Mechanics Natl. Bank v. Killeen,* 377 Mass. 100, 109 (1979).

---

[11]    Moreover, as explained above, to the extent that NStar's 93A claim is based on the same set of facts as its negligent misrepresentation and fraud claims, it is barred by the statute of limitations.

*Kobayishi v. Orion Ventures, Inc.*, 42 Mass. App. Ct. 492, 505 (1997). NStar does not, and cannot, allege that Okonite breached the Contract, if at all, to gain an economic advantage or to extort a concession. Nor has NStar alleged, nor can it, that Okonite intentionally breached the Contract or the warranties. Nor has NStar alleged, nor can it, that Okonite failed to disclose any problems with the Cable of which it was (or is) aware. Rather, as the facts alleged in the Complaint show, Okonite has repaired the Cable each time a splice has failed, and NStar and Okonite simply have a difference of opinion as to whether that is sufficient under the Contract. In the end, even if this Court were to find that Okonite is wrong in its opinion that it has more than satisfied its obligations under the Contract, its position is valid, non-frivolous, and made in good faith. *Cf. Orlando v. Boston Edison Co.,* 1998 WL 930583 (rejecting 93A claim where opposing parties' positions were not frivolous and not made for any ulterior purpose or to gain any undeserved benefit).

As such, this is an ordinary contract dispute without conduct that is unethical, immoral, oppressive, or unscrupulous. There is, therefore, no basis for NStar's 93A claim.

## IV.    The Limitation of Liability Provision Limits NStar's Damages and Bars Its 93A Claim Entirely.

The UCC provides that the measure of damages for breach of warranty is "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted." Mass. Gen. L. ch. 106, § 2-714. Although the UCC also provides for incidental and consequential damages in proper cases, *id.*, NStar is not entitled to such damages because the Contract contains a limitation of liability provision that bars consequential and incidental damages and that provision is enforceable even if the exclusive remedies provision is found to have failed of its essential purposes. The limitation of liability provision states that "[Okonite] will not be responsible for any incidental or consequential

damages whatsoever, either direct or indirect, resulting from a failure of the System." <u>Exh. A</u>, Section 2, § 11.0(N), at 6.

Limitation of liability provisions like the one in the Contract represent "a reasonable accommodation between two commercially sophisticated parties" that are enforceable and consistent with public policy. *Canal Electric Co. v. Westinghouse Elec. Corp.*, 406 Mass. 369, 372-73 (1990)(*Canal Electric I*). The Supreme Judicial Court has thus held that where the two parties to an agreement are sophisticated business entities, as are NStar and Okonite, their agreement to limit a remedy, even where consequential damages could be extensive, "is a reasonable business practice." *Deerskin Trading Post, Inc. v. Spencer Press, Inc.*, 398 Mass. 118, 124 (1986). Limitations of remedy are likewise plainly enforceable under Article 2 of the UCC. See Mass. Gen. Laws ch. 106 §§ 2-719(a) (agreement for sale of goods may limit the measure of damages recoverable under Chapter 106, Article 2). Limitation of liability clauses are enforceable even where the buyer is not thereby made whole. *See Canal Electric I*, 406 Mass. at 372-73; *Logan Equipment Corp. v. Simon Aerials, Inc.*, 736 F. Supp. 1188 (D. Mass. 1990). Under Massachusetts law, limitation of liability provisions such as the one in the Contract are enforceable except where the seller either willfully repudiated the contract or was willfully dilatory in performing its warranty obligations, circumstances clearly not present in this case. *Cambridge Plating Co., Inc. v. Napco, Inc.*, 85 F.3d 752 (1st Cir. 1996).

Importantly, the Supreme Judicial Court has unambiguously held that a limitation of liability provision in a contract is enforceable even where an accompanying exclusive remedy provision fails of its essential purpose. *Canal Electric I*, 406 Mass. at 372. The Court explained:

> The disclaimer of consequential damages is an entirely separate
> contractual provision from the limited repair or replacement remedy and

> thus survives the failure of the limited remedy. "The limited remedy of
> repair and a consequential damages exclusion are two discrete ways of
> attempting to limit recovery for breach of warranty.... The former
> survives unless it fails of its essential purpose, while the latter is valid
> unless it is unconscionable.

*Id.* at 375 (citations omitted.).

Accordingly, even if Okonite were found to have breached the warranty and that the

exclusive remedies provision in the Contract failed of its essential purposes, the limitation of

liability provision in the Contract, which bars incidental or consequential damages, either direct

or indirect, would nevertheless limit NStar's damages for any claim resulting from any failure in

the cable system. As such, even if NStar were successful on any of its claims, the most it could

recover is the difference between the value of Cable as warranted and the value of the actual

Cable, which NStar has used without incident for most of its lifetime. Thus, NStar's claims for

revenue it allegedly lost during times that the Cable was not operational are barred because lost

income is a classic consequential damage. *See, e.g., Canal Electric II*, 756 F. Supp. 627.[12]

Furthermore, the limitations of liability provision of the Contract bars NStar's 93A claim

in its entirely. Massachusetts law is clear that where a 93A claim is based on the same set of

facts as a breach of warranty claim and there is a limitation of liability provision that excludes

consequential damages, the plaintiff cannot maintain a claim for violation of 93A. *See Canal*

*Electric I*, 406 Mass. at 309; *Boston Helicopter Charter, Inc. v. Agusta Aviation Corp.*, 767 F.

Supp. 363, 377 (D. Mass. 1991); *Sosik v. Albin Marine, Inc.*, 2003 WL 21500516 *10 (Mass.

Super. Ct. 2003)(Fishman, J.). In so holding, the Supreme Judicial Court reasoned that a claim

---

[12]     Moreover, there is no basis in law or fact for NStar to make any claims for any hypothetical losses suffered
by customers during times that the Cable was out of service. Even if NStar's customers suffered damages, which
they should not have since NStar provided electricity through its required back-up sources such that only a few
customers lost electricity for short periods of time, those damages are barred by the economic loss rule, *see, e.g.*
*Canal Electric II*, 756 F. Supp. at 629-30, and there is no reason that NStar, rather than its customers, would receive
those damages, if they even existed and were recoverable.

under Section 11 of Chapter 93A that arises from the same set of facts as the breach of warranty claim is duplicative because only actual damages, combined with attorneys' fees, are recoverable and that in Section 11 cases, unlike Section 9 cases, "the dispute is a purely commercial one that does not affect the public interest" and, thus, enforcing the limitation of liability provision would not frustrate the public policies underlying Chapter 93A.  *Canal Electric I*, 406 Mass. at 378-379 (citing *Linthicum v. Archambault*, 379 Mass. 381, 387 (1979)).  In this case, NStar's 93A claim arises out of exactly the same set of facts as its breach of warranty claims.  As such, NStar cannot maintain its 93A claim.

### Conclusion

For the foregoing reasons, Okonite requests that the Court grant summary judgment in favor of Okonite on all counts of the Complaint.  In the alternative, Okonite requests that if the Court does not grant summary judgment on any given claim, the Court nevertheless rule that even if NStar succeeds on that claim, its damages are limited to the difference between the Cable as warranted and the Cable as provided.

THE OKONITE COMPANY
By their attorneys,


/s/ Andrea C. Kramer
Robert E. Sullivan, BBO # 487820
    sulli@swmlawyers.com
Andrea C. Kramer, BBO #632584
    akramer@swmlawyers.com
Sullivan Weinstein & McQuay, P.C.
Two Park Plaza, Suite 610
Boston, MA  02116-3902
Dated:  February 18, 2005    617-348-4300