UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH ELECTRIC COMPANY, d/b/a NSTAR ELECTRIC,<br><br>Plaintiff,<br><br>vs.<br><br>THE OKONITE CO.,<br><br>Defendant | Civ. A. No. 1:04-CV-11681-RCL |

**COMMONWEALTH ELECTRIC COMPANY, d/b/a NSTAR ELECTRIC'S
<u>ANSWERS TO INTERROGATORIES PROPOUNDED BY THE OKONITE CO.</u>**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, the plaintiff, Commonwealth Electric Company, d/b/a NSTAR Electric ("NSTAR Electric"), responds as follows to the interrogatories propounded by the defendant, The Okonite Co. ("Okonite").

<u>GENERAL OBJECTIONS</u>

NSTAR Electric objects to these interrogatories to the extent they call for information protected by the attorney-client privilege or the work product rule. NSTAR Electric also objects to Definition 2 to the extent it imposes obligations greater than those imposed by Local Rule 26.5 and to Definition 6 to the extent it fails to identify all documents that are part of the Contract. NSTAR Electric also objects to these interrogatories to the extent they are premature and reserves the right to supplement its responses after undertaking further discovery.

<u>RESPONSES</u>

1.  Identify all documents or statements that you contend comprise the

the cable was not fit for the ordinary purpose for which an undersea cable is used and that the cable would not pass without objection in the trade. Okonite also had reason to know the particular purpose for which NSTAR Electric was purchasing the cable, namely, as an undersea cable in the Vineyard Sound. Okonite therefore also implicitly warranted that the cable was fit for that purpose. In light of the several failures, which Okonite has repaired at its cost, it is apparent that the cable was not in fact fit for its intended purpose.

Okonite breached the contract by failing to provide NSTAR Electric with what it promised, namely, a Submarine, Land & Optical Fiber Cable System capable of providing reliable electricity and fiber-optic service to Martha's Vineyard.

3. State the basis for the allegation contained in Paragraph 1 of the Complaint that "[u]nder the terms of the Agreement, Okonite promised, *inter alia,* to provide NSTAR Electric with a cable system 'free of defects,' and to perform all work under the Agreement in a 'good, acceptable and workman like manner.'"

Response. The General Terms and Conditions provide: "The Contractor warrants that it shall use new first-class materials throughout, and warrants that it shall perform the work in a good, acceptable and workman like manner." The General Terms and Conditions also provide: "The Contractor warrants to the company, for a ten (10) year period commencing with the Date of Acceptance ("Warranty Period"), all of the Submarine/Land/Optical Fiber Cable System ("System") from terminal to terminal, will be free from defects in material and workmanship provided the System is employed under conditions contemplated and covered by the design specifications, and provided further that the System is maintained and operated in accordance with the Contractor's recommended standards and procedures."

4. State the basis for the allegation contained in Paragraph 6 of the

trained personnel so that a long period (40 years) of reliable service can be expected."

14. Identify and describe all the "oral and written representations and warranties" by Okonite, as referenced in Paragraph 14 of the Complaint.

Response. Objection. NSTAR Electric objects to this objection on the grounds that it is overly broad and unduly burdensome. Okonite may have made oral representations or warranties to NSTAR Electric or its employees or agents that NSTAR Electric has not yet discovered in the course of its internal investigation. The interrogatory is unduly burdensome because Subject to these objections, NSTAR Electric responds as follows.

Okonite's written warranties are at pp. 1 and 9 of the General Terms and Conditions and p. 30 of Exhibit B to the Contract. Okonite's written representations may be derived or ascertained from the Contract documents themselves, and pursuant to Rule 33(c), the burden of cataloguing Okonite's representations is the same for Okonite as for NSTAR Electric.

15. State the basis for the allegation contained in Paragraph 17 of the Complaint that "[t]he first three failures occurred in the transition zone between the factory splice and the Cable. The most recent failure occurred within the splicing enclosure and adjacent to a field splice installed by Okonite during the course of a November 2003 repair to a faulty factory splice. Thus, both the nature and location of these failures are indicative of a defect in the design, manufacture and/or installation of both the original factory splices and the replacement field splices."

Response. Objection. This interrogatory calls for expert opinion evidence insofar as it seeks information concerning the inferences to be drawn from the nature and location of the failures. NSTAR Electric has not yet identified a testifying expert. NSTAR Electric will provide an expert report stating the basis for its allegations in accordance with the applicable Rules of Civil Procedure and the case management schedule in this action. Subject to this objection, NSTAR Electric states that tests and

9

investigations conducted after each failure show that the failures occurred in the areas alleged in Paragraph 17 of the Complaint.

16. State the basis for the allegation contained in Paragraph 18 of the Complaint that the 1996 cable "originally had 15 factory splices" and "now has 23 splices, of which 8 are original factory splices and 15 are field splices that are bunched in unstaggered pairs of three inside of coffin boxes."

Response. NSTAR Electric understands that the 1996 cable as originally supplied by Okonite included 15 factory splices, and as a result of Okonite's subsequent repair efforts now has 23 splices. Of these 23 splices NSTAR Electric understands from information submitted by or on behalf of Okonite that eight are original factory splices, and 15 are field splices bunched in unstaggered pairs of three inside coffin boxes.

17. If you contend that the field splices are inferior in any way to the factory splices, state the basis for your contention.

Response. Objection. This interrogatory calls for expert opinion evidence. NSTAR Electric has not yet identified a testifying expert. NSTAR Electric will provide an expert report stating the basis for its allegation that the failures were caused by cable defects in accordance with the applicable Rules of Civil Procedure and the case management schedule in this action.

18. State the basis for the allegation contained in Paragraph 19 of the Complaint that "[t]he System failures have resulted in significant interruptions of service to NSTAR's customers, and caused NSTAR and its customers to incur extraordinary expenses associated with responding to these failures, and in purchasing replacement power."

Response. Objection. NSTAR Electric objects to this interrogatory insofar as it calls for information concerning expenses incurred by NSTAR Electric's customers. NSTAR Electric expects to obtain such information in the course of pre-trial discovery

10

and will supplement its response as required. Subject to this objection, NSTAR Electric responds as follows.

    A.    <u>August 16, 1997 Failure.</u> 5,177 customers lost service for approximately 83 minutes. The incident caused 7,162 customer outage hours. NSTAR Electric reserves the right to supplement this response with additional information about its costs.

    B.    <u>November 25, 1999 Failure.</u> 5,375 customers lost service for approximately 35 minutes. The incident caused 3,135 customer outage hours. NSTAR Electric reserves the right to supplement this response with information about its costs.

    C.    <u>October 26, 2003 Failure.</u> 3,988 customers lost service for approximately 91 minutes. The incident caused 4,429.4 customer outage hours. NSTAR Electric incurred out-of-pocket expenses for labor, materials, third-party contracts, and generation totaling $144,735.59.

    D.    <u>March 7, 2004 Failure.</u> 3,834 customers lost service for approximately 70 minutes. The incident caused 4,473 customer outage hours. NSTAR Electric incurred out-of-pocket expenses for labor, materials, third-party contracts, and generation totaling $48,623.01.

    19.    Describe (including dates and length and number of customers affected) all outages or interruptions in service experienced as result of the Splice Failures, including what alternative means of delivering electricity, if any, were used during the outages or interruptions in service.

    <u>Response.</u>    NSTAR Electric incorporates its response to Interrogatory 18. Further answering, NSTAR Electric states that it responded to the cable failures by using both additional on-Island generation and by adding load to other existing submarine cables.

    20.    Describe and identify all the testing referenced in Paragraph 20 of the

Complaint.

Response.    NSTAR Electric incorporates its response to interrogatory 21 and states that it conducted "thumper" tests in connection with fault location after each of the four cable failures.

21.    State the basis for the allegations contained in Paragraph 20 of the Complaint that "[t]he testing required NSTAR Electric to run high voltages through the Cable lessening the Cable's useful life." In responding to this interrogatory, state the basis for both parts of the allegation: (1) that the testing required NSTAR Electric to run high voltages through the Cable and (2) that such testing allegedly lessened the Cable's useful life.

Response.    Objection. The second sub-part of this interrogatory calls for expert opinion evidence. NSTAR Electric has not yet identified a testifying expert. NSTAR Electric will provide an expert report stating the basis for its allegation that the thumper test lessened the cable's useful life in accordance with the applicable Rules of Civil Procedure and the case management schedule in this action.

Subject to this objection, NSTAR Electric answers the first subpart of the interrogatory as follows. NSTAR Electric localized the faults in the cable by having performed a "thumper" test. In this test, which was performed with Okonite's knowledge and acquiescence, high-voltage direct current was run through the cable. The test caused an arc of electricity to travel from the location of the fault into the earth. The voltage was required to be high enough both to cause an arc and to cause such a strong arc that a loud sound would result. This sound allowed personnel, including divers, to localize the fault.

22.    State the basis for the allegation contained in Paragraph 1 of the Complaint that "additional repairs would not provide NSTAR with an as-warranted cable system."

12

Response.    Objection. This interrogatory calls for expert opinion evidence. NSTAR Electric has not yet identified a testifying expert. NSTAR Electric will provide an expert report stating the basis for its allegation that the additional repairs would not provide NSTAR Electric with an as-warranted cable system in accordance with the applicable Rules of Civil Procedure and the case management schedule in this action.

23.   State the basis for the allegation contained in Paragraph 1 of the Complaint that "NSTARis left with a defective cable system that cannot be relied upon to provide critical electric and data transmission capacity to Martha's Vineyard."

Response.    Objection. This interrogatory calls for expert opinion evidence. NSTAR Electric has not yet identified a testifying expert. NSTAR Electric will provide an expert report stating the basis for its allegation in accordance with the applicable Rules of Civil Procedure and the case management schedule in this action. Subject to this objection, NSTAR Electric states that given the history of cable failures, and given NSTAR Electric's obligations to its regulators and customers to provide an uninterrupted supply of electricity to Martha's Vineyard, NSTAR Electric cannot reasonably rely on the cable, particularly in times of peak demand.

24.   State the basis for the allegation contained in Paragraph 1 of the Complaint that "[r]epeated repair work has weakened the cable and diminished its life expectancy."

Response.    Objection. This interrogatory calls for expert opinion evidence. NSTAR Electric has not yet identified a testifying expert. NSTAR Electric will provide an expert report stating the basis for its allegation that the failures were caused by cable defects in accordance with the applicable Rules of Civil Procedure and the case management schedule in this action.

25.   State the basis for the allegation contained in Paragraph 21 of the Complaint that "continued testing, cable raising, and field splicing will inevitably result

13

in further damage and loss of useful life to an already defective System."

<u>Response.</u>   Objection. This interrogatory calls for expert opinion evidence. NSTAR Electric has not yet identified a testifying expert. NSTAR Electric will provide an expert report stating the basis for its allegation that the failures were caused by cable defects in accordance with the applicable Rules of Civil Procedure and the case management schedule in this action.

26.   State the basis for the allegation contained in Paragraph 23 of the Complaint that "[i]nstead of a System that was reasonably expected to remain in operation for forty or more years, NSTAR Electric is left with a defective System that cannot be adequately repaired."

<u>Response.</u>   Objection. This interrogatory calls for expert opinion evidence. NSTAR Electric has not yet identified a testifying expert. NSTAR Electric will provide an expert report stating the basis for its allegation that the failures were caused by cable defects in accordance with the applicable Rules of Civil Procedure and the case management schedule in this action.

27.   State the basis for Nstar's contention that the 1996 cable was reasonably expected to remain in operation for forty or more years, as alleged in Paragraph 23.

<u>Response.</u>   NSTAR's experience is that in general, undersea cables can be expected to last approximately forty years. NSTAR Electric uses a forty-year life to calculate depreciation on the cable for accounting purposes, and NSTAR Electric believes that this measure of lifespan is reasonable given its experience in the industry. Moreover, as stated in the response to Interrogatory 13, Okonite also represented that the cable could be expected to last for forty years.

28.   State the basis for the allegation contained in Paragraph 32 of the Complaint that "[t]he goods Okonite sold to NSTAR Electric pursuant to the Agreement were not of merchantable quality insofar as they would not pass without objection in the trade under the contract description."

14

The foregoing answers are made on behalf of Commonwealth Electric Company ("NSTAR Electric"), and not the undersigned individual, who is signing in her representative capacity. The information contained therein is derived from multiple sources within and available to NSTAR Electric, and NSTAR Electric believes such information to be true. By signing below under penalties of perjury the undersigned intends solely to meet NSTAR Electric's obligations under Rule 33 of the Federal Rules of Civil Procedure and does not represent that she has personal knowledge of the information contained therein.

    I declare under penalty of perjury that the foregoing is true and correct. Executed on January 24, 2005.

*Pamela J. Szatek*

As to objections:

*Daniel J. Lyne (BBO No. 309290)*
Theodore J. Folkman (BBO No. 647642)
HANIFY & KING, P.C.
One Beacon Street
Boston, Mass. 02108
(617) 423-0400

Dated: January 24, 2005

421985