UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH ELECTRIC CO., d/b/a NSTAR ELECTRIC,<br><br>         Plaintiff,<br><br>v.<br><br>THE OKONITE CO.,<br><br>         Defendant. | No. 04-11681-RCL |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

INTRODUCTION

This is an action for breach of contract, misrepresentation, and breach of express and implied warranties arising out of the sale of a defective 35kv submarine power cable system to the Plaintiff, Commonwealth Electric Company, d/b/a NSTAR Electric ("NSTAR Electric"). The cable system runs between the Town of Falmouth and Martha's Vineyard and transmits power to thousands of NSTAR Electric customers. The defective cable was designed, manufactured, and installed by Okonite pursuant to a written contract executed in 1994 (the "Agreement"). Under the terms of the Agreement, Okonite promised, *inter alia*, to provide NSTAR with a cable system "free of defects," and to perform all work under the Agreement in a good and "workmanlike manner." Okonite failed to keep its promise because the cable system has failed on four separate occasions due to cable defects. The failures have resulted in prolonged service interruptions to NSTAR Electric's customers. Most importantly, Okonite's repairs (field splicing) are fundamentally at odds with what Okonite promised in the Agreement (factory splices), and they create inherent weak points throughout the Cable. As a result, NSTAR

is left with a cable that cannot be relied upon to provide critical transmission capacity to Martha's Vineyard.

Okonite's motion is premature and contingent upon the resolution of factual issues that cannot be determined prior to the completion of discovery. The parties are still in the process of conducting documentary discovery and have not yet taken any depositions or made any expert disclosures. NSTAR Electric has not even engaged a testifying expert yet. Okonite seeks to cut discovery completely out of the litigation by moving for summary judgment on all issues before so much as a single deposition has been taken. However, the facts are both complex and in sharp dispute. For the following reasons, the motion must be denied or at least deferred until discovery is complete.

## FACTS

A.   Background And The Need For A New Cable

NSTAR Electric provides electricity service to Martha's Vineyard.  NSTAR Electric provides service in two ways. First, it generates small amounts of electricity using Mirant generators situated on-Island. Second, it transmits electricity from the mainland via undersea power cables. (Foley Decl. ¶¶ 3-4). Prior to the installation of the cables at issue in this case, NSTAR Electric had two submarine cables running from mainland Massachusetts to Martha's Vineyard. Each of these cables had a capacity of 17 MW.[1]  On-Island generators produced another 12.5 MW of capacity, for a total capacity of 46.5 MW. (Foley Decl. ¶ 4).

Electricity is a basic and critical utility service. NSTAR Electric is required by applicable regulations to maintain sufficient "firm capacity" to meet projected demand. "Firm capacity" means the remaining capacity available after the largest power supply source element supplying a given locus is lost. For instance, prior to the installation of the cables at issue in this case,

---

[1] MW stands for megawatt, a unit of power.

2

NSTAR Electric's firm capacity for Martha's Vineyard was 27.5 MW (*i.e.*, 46.5 MW total capacity less one 17MW cable, less 2 MW to account for the contract between NSTAR Electric and Mirant, which required Mirant to provide only 10MW of firm capacity). (Foley Decl. ¶ 5).

In the early 1990s, demand for electricity on Martha's Vineyard increased dramatically. By the summer of 1995, Island peak demand reached 36.1 MW, substantially more than NSTAR Electric's firm capacity at the time. In response, NSTAR Electric determined that it was necessary to install an additional undersea cable from the mainland. Without the new cable, NSTAR Electric would have been unable to supply projected demand in the event one of the existing cables failed. NSTAR Electric anticipated that the situation would become worse as demand on the Vineyard, particularly in the summer months, continued to increase. (Foley Decl. ¶ 6). NSTAR Electric therefore issued a Request for Quote ("RFQ") in April 1994. The RFQ was for a three-phase 34.5kv armored submarine cable and fiber optic system designed to supply electricity and data transmission service to customers on the Vineyard. (Szatek Decl. ¶ 3). Several bidders, including Okonite and other leading cable manufacturers, submitted bids. (Szatek Decl. ¶ 4).

B.     Okonite's Bid

Okonite's bid called for lengths of armored cable to be spliced together, rather than for use of a single run of armored cable. (Szatek Decl. ¶ 5).  Okonite proposed to perform all of the necessary cable splicing at a factory rather than splicing the cable during the cable-laying operation. (Szatek Decl. ¶ 6). Indeed, Okonite represented, in response to an NSTAR Electric inquiry, that it would furnish a cable "without field splices." (Szatek Decl. ¶ 6).

Okonite also made representations, ultimately incorporated into the contract between Okonite and NSTAR Electric as exhibits, that touted the reliability of its product.[2] For instance (Szatek Decl. ¶ 7):

- Okonite represented that its product had a "*long, <u>trouble-free</u> in-service record.*" (Emphasis supplied)

- Okonite represented that "the use of statistical process control and inspection procedures… so that today the Okogard cables produced by Okonite are of the highest quality and uniformity in the industry… This long, trouble free in service record is unmatched by any other medium voltage cable system…"

- Okonite represented that it had subjected its product to "continuous testing at four (4) times rated voltage to ground (35kV), and load cycled to 90°C each and every day," and that the product had "withstood this severe testing protocol for well over 1100 days without any failure."

- Okonite represented that it had subjected its product to impulse or switching surge tests, and that the tests "severely stressed the Okoguard insulation system and did not record any failures after over **4-1/2 years of accumulated testing time.**" (Emphasis in the original).

- Okonite represented: "*One hundred percent reliability, is not a goal but a reality.*"

- Okonite represented: "With over 25 years of service life experience in submarine applications Okoguard provides a balance of properties that include reliability, flexibility, high ampacity rating and retained dielectric strength."

---

[2] All of Okonite's important pre-contract written representations were included in the Agreement as Exhibits A-I.

4

C.      NSTAR Electric's Selection of Okonite

NSTAR Electric evaluated Okonite's bid and the bids of its competitors, and it ultimately selected Okonite. (Szatek Decl. ¶ 9). In selecting Okonite, NSTAR Electric relied on the representations and promises described above, all of which were set forth in Exhibits to the Agreement. (Szatek Decl. ¶ 10). Okonite's representations concerning the reliability of its product were highly material, because of the critical importance of reliability in NSTAR Electric's business. (Szatek Decl. ¶ 10). Okonite's representation that it would not use field splices was particularly material to NSTAR Electric's decision to contract with Okonite. (Szatek Decl. ¶ 12). Factory splices are inherently superior to field splices because factory splices are performed in a strictly controlled environment. (Dey Decl. ¶ 7). Because of that, NSTAR Electric specifically asked, "Will any field splices be required?" Okonite's written response was direct and to the point:

> Our proposal offers a unique and effective project installation arrangement having the following benefits:
>
>> *1 – The submarine cable will be furnished manhole to manhole without field splices.*

(Emphasis added). (Dey Decl. ¶ 10).

D.      The Agreement

On or about August 19, 1994, NSTAR Electric entered into a written agreement with Okonite ("the Agreement") for the purchase and installation of a +/- 38,000-foot submarine, land, and optical fiber cable system connecting Falmouth and Martha's Vineyard. The price was $3,122,106. (Szatek Decl. ¶ 14). Under the Agreement, Okonite was required to install the cable in accordance with best construction practices and to provide NSTAR Electric with a complete and fully operable system. Okonite was also required to install the cable using "*state of the art methods, procedures, equipment and specifically trained personnel so that a long period (40*

5

*years) of reliable service can be expected.*" (Szatek Decl. ¶¶ 15-16). The Agreement also contained an express warranty, providing in pertinent part:

> The Contractor [Okonite] warrants to the Company [NSTAR Electric], for a ten (10) year period commencing with the Date of Acceptance ("Warranty Period"), all of the Submarine/Land/Optical Fiber Cable System ("System") from terminal to terminal, **will be free from defects in material and workmanship** provided the System is employed under conditions contemplated and covered by the design specification, and provided further that the System is maintained and operated in accordance with the Contractor's recommended standards and procedures. The Date of Acceptance shall be deemed as that date when successful final Field Acceptance Tests are completed as provided for in the Specifications.

(Szatek Decl. ¶ 17) (emphasis added).

Consistent with the importance of factory splices to NSTAR, the Cable Specification attached to the Agreement expressly provided,

> 10.0 <u>CABLE SPLICES AND TERMINATIONS</u>
>
> 10.1 The cable manufacturer will be responsible for all factory splices in the submarine cable system and if not actually making the splices will supply supervision to oversee and approve this work.
>
> 10.2 It is expected that the submarine cable circuit requirement shall be supplied in one continuous length without field splices.

Agreement, Exhibit B, Cable Specification, ¶10. (Szatek Decl., Ex. 7). The Agreement further provided,

> M. CUTTING AND PATCHING
>
> The Contractor shall be responsible for all cutting, fitting or patching of the Work that may be required to make its several parts fit together properly…

Agreement, General Terms and Conditions – Section 2, ¶M. (Szatek Decl., Ex. 7).

E. <u>Installation of the Cable</u>

Okonite manufactured and installed a power cable, known as the #75 cable, pursuant to the Agreement. The #75 cable was first energized on May 16, 1995. (Szatek Decl. ¶ 18). It failed on June 22, 1995. (Szatek Decl. ¶ 19). Okonite admitted that the cable was defective. (Szatek

6

Decl. ¶ 19). Okonite, by agreement with NSTAR Electric, replaced the cable with a second cable, known as the #99 cable, with a new ten-year warranty to run from the date of the final field test on the new cable. The new ten-year warranty began to run on December 3, 1996. (Szatek Decl. ¶ 20).

F.      The Cable Failures

The #99 cable has failed on four separate occasions. Each failure has occurred at or near one of Okonite's splices. On each occasion, thousands of NSTAR Electric customers lost power. (Foley Decl. ¶¶ 7-10). Okonite "repaired" the cable after each failure by cutting out a factory splice and replacing it with six field splices. (Foley Decl. ¶ 11). The last cable failure involved the failure of one of the replacement field splices.  Although power was restored to the Island quickly after each failure, the #99 cable was out of service for repairs for months at a time. For example, after the November 1999 cable failure, the necessary repairs and testing were not complete until February 2000 (Szatek Decl. ¶12). During one of the repair periods, NSTAR lacked sufficient "firm capacity" to meet peak demand on the Island. (Foley Decl. ¶ 12).

The cause of the cable failures is in sharp dispute. Various consultants retained by both sides have reached differing conclusions about the nature of the defects. One Okonite employee opined that "somebody must have nicked the insulation while ring-cutting and removing the original jacket" and that the nick was the cause of one of the failures. (Dey Decl. ¶ 11). One consultant opined "the fault may have occurred due to an electrical discontinuity in the shield assembly; perhaps due to cable assembly, in factory handling or during installation." This expert noted "staining of the insulation in the area of the fault" and concluded that this staining "resulted from water entering through the polyethylene jacket as a result of the fault." (Dey Decl. ¶ 11). Another consultant opined that the "defects most likely causing the cable failures are the ridges on the cable metallic shield, which deeply protrude into the extruded insulation shield and

7

leave indents on the insulation." This consultant suggested that these ridges might have occurred because "the joint metallic shield was applied in the opposite direction of lay, as compared to the original cable shield. Such design," the consultant suggested, "could facilitate partial unwinding of copper tapes during thermo-mechanical deformations, resulting in looseness of the tapes and, finally, in creating the ridges." (Dey Decl. ¶ 11). The consultant ultimately concluded "the most likely reason for the in-service failures was looseness of the cable metallic shield resulting in the development of sharp ridges on the shield, harming the outer layers of the cable insulation system." (Dey Decl. ¶ 11).

G.    The Effect of Repairs and Testing

There is no dispute as to how the faults were located, or the "cure" effected by Okonite. Each time the cable failed, NSTAR Electric was required to repeatedly "thump" the cable using a high DC current. Thumping is a procedure used to localize the failure. Once the fault was located, Okonite raised the cable, cut out the affected area and spliced in a new section of cable using multiple field splices. All of the filed splicing was done on the deck of a barge in the middle of Vineyard Sound. As a result, the #99 cable, which originally had fifteen factory splices (in five groups of three), now has eight original factory splices and fifteen field splices. (Dey Decl. ¶ 8). The Agreement expressly prohibits field splices because filed splices are inherently inferior to factory splices.

ARGUMENT

A.    Under Rule 56(f), The Motion Must Be Deferred If Not Denied Outright.

A defendant may move for summary judgment "at any time." Fed. R. Civ. P. 56(b). That being said, the Court need not and should not consider the merits of a motion for summary judgment as premature as the instant motion. Where it appears that the party opposing the motion

> cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed. R. Civ. P. 56(f). The Rule requires the non-moving party to: (1) explain its current inability to adduce the necessary facts to oppose the motion; (2) provide a plausible basis for believing that those facts can be assembled in a reasonable time; and (3) indicate how the facts would influence the outcome of the summary judgment motion. Velez v. Awning Windows, Inc., 375 F.3d 35, 40 (1st Cir. 2004).

    1.    NSTAR Electric Cannot Now Fully Oppose The Motion.

NSTAR Electric cannot be expected to cite chapter and verse at this early date. As detailed in the Affidavit of Daniel J. Lyne, Esq., NSTAR Electric has yet to resolve its dispute with Okonite regarding the sufficiency of Okonite's document production and answers to interrogatories. NSTAR Electric has served a subpoena duces tecum on Simplex Wire & Cable Co., Okonite's subcontractor, but has yet to receive any documents, despite repeated requests to Simplex. No depositions have gone forward because Okonite's document production is self evidently incomplete. Finally, NSTAR Electric has not yet retained a testifying expert.

The Court established a case management schedule in this case. Okonite's motion seeks to short-circuit the Case Management Order. NSTAR Electric is not required to make any expert

9

disclosures under the case management schedule until August 2005. Yet NSTAR Electric is in the position of having to provide evidence to prove that the repeated repairs and testing that have followed each of the cable failures have damaged and will continue to damage the cable without the benefit of either discovery or expert assistance.[3]

NSTAR Electric has had no real opportunity to uncover Okonite's position regarding the cause of the cable failures or the effect of repeated repairs and testing on the cable, nor under the case management schedule is NSTAR Electric even <u>entitled</u> to discover Okonite's expert opinion evidence until at least September 30, 2005, the date on which Okonite is required to disclose its expert witnesses.

NSTAR Electric also needs an opportunity to depose Okonite fact witnesses and to take discovery of third parties. Such discovery will be directed towards, for example, what Okonite knew about reliability problems with its technology at the time it made its representations to NSTAR Electric; whether other similar cables installed for other buyers have failed under similar circumstances; on what basis Okonite decided to repair rather than replace the cable (especially in light of its decision to replace the cable following the initial failure), including what reliability studies Okonite has performed comparing the in-field performance and projected life of field versus factory splices.

2. <u>The Evidence Will Be Available In A Reasonable Time</u>

There is no question that NSTAR Electric will be able to adduce the evidence noted above through discovery. After NSTAR Electric receives and reviews the documents it has requested from Simplex Wire & Cable, it intends to notice depositions both under Rule 30(b)(6)

---

[3] Okonite has wrongly claimed (Mem. at 2 n.1) that NSTAR Electric has no evidence on this point. It points to NSTAR Electric's responses to interrogatories. But as a cursory look at those responses shows, Okonite's reading is wrong. NSTAR Electric objected to the relevant interrogatory on the grounds that it called for expert testimony prior to the deadlines for expert disclosures set out in the case management schedule. Rather than filing a discovery motion to challenge NSTAR Electric on this point, Okonite chose to file this premature motion.

and to named Okonite and third-party witnesses. NSTAR Electric will serve additional written discovery requests after the initial round of depositions are completed. Finally, NSTAR Electric will retain a testifying expert to assist it during the discovery process. NSTAR intends to pursue its discovery rights diligently.

        3.       The Facts Yet To Be Discovered Are Critical To NSTAR Electric's Defense of Okonite's Dispositive Motion.

It is impossible to say whether the warranty limitation provision has failed of its essential purpose until the cause of the failures, the effects of past and future repairs on the cable, and Okonite's internal reliability studies are fairly the subjects of discovery. Failure of essential purpose is inherently fact-driven, and the relevant questions are questions of degree. Similarly, the question of when NSTAR Electric reasonably should have known that Okonite's reliability claims were false is fact-driven.

Nor can NSTAR Electric be expected to prove that Okonite's representations regarding the quality and reliability of its product were false without having an opportunity to discover the facts concerning Okonite's reliability history in other submarine cable settings, the reliability of comparable products made by other manufacturers, and of course the actual cause of the cable failures here.

In these circumstances, it is clear that the Court should defer a hearing on the motion pursuant to Rule 56(f).

B.     Okonite Is Not Entitled To Summary Judgment On The Warranty Claims

The Agreement is a sales contract governed by the Uniform Commercial Code. Okonite is contractually entitled to repair, rather than replace, the cable unless, as provided in G.L. c. 106, § 2-719, "circumstances" have caused the "exclusive or limited remedy to fail of its essential purpose." The parties disagree whether the exclusive remedy has failed of its essential purpose

11

here. Okonite goes so far as to say that even if, as NSTAR Electric argues, the post-failure testing and splicing necessary to repair the cable after each of the many failures has diminished the cable's life span, NSTAR Electric cannot recover because, as a matter of law, the exclusive remedy provision has not failed of its essential purpose. Okonite's argument fails for two reasons. First, failure of an essential purpose is a question of fact that a jury could decide in NSTAR Electric's favor. Second, the applicable precedent contradicts Okonite's argument.

       1.       <u>Failure Of Essential Purpose Is Inherently A Question Of Fact</u>

As Okonite admits, the issue of whether a warranty has failed of its essential purpose is typically a factual issue that must be determined by a jury. (Mem. at 10). <u>See</u>, <u>e.g.</u>, <u>Piper Jaffray & Co. v. SunGard Sys. Int'l, Inc.</u>, 54 U.C.C. Rep. Serv. 2d (CBC) 1088 (D. Minn. 2004); <u>Rheem Mfg. Co. v. Phelps Heating & Air Conditioning, Inc.</u>, 746 N.E.2d 941, 948 (Ind. 2001); <u>Sosik v. Albin Marine, Inc.</u>, 16 Mass.L.Rep. 398 (Super. Ct. 2003); <u>Laidlaw Transp., Inc. v. Helena Chem. Co.</u>, 680 N.Y.S.2d 365, 367 (App. Div. 1998).

The cases cited by Okonite in support of its motion do not even remotely resemble the facts of the present case. (Mem. at 10-11). For example, in <u>Riegel Power Corp. v. Voith Hydro</u>, 888 F.2d 1043 (4th Cir. 1989), all of the failures of the turbine took place after the warranty had expired. <u>Transport Corp. of Am. v. International Bus. Machs. Corp.</u>, 30 F.3d 953 (8th Cir. 1994), involved a hard disk drive that failed once, and that the buyer refused to let the seller repair in accordance with its repair policy. In <u>New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp.</u>, 564 A.2d 919 (Pa. Super. Ct. 1989), the strongest allegation the buyer could make was that the seller promised to make repairs by a certain date and delayed for approximately one month; the court held that this allegation was insufficient as a matter of law in any case because it was barred by the parol evidence rule. There was no allegation in the case remotely like the

allegation here, namely that repairs and the testing that goes with them both damages the product, and creates a substitute product that is expressly non-conforming.

        2.        <u>Down Time Is Relevant To Failure Of Essential Purpose.</u>

Okonite ignores the particular compelling facts of this case. Okonite makes light of the effect on NSTAR Electric of the down time caused by the cable's repeated failures, noting that the cable has operated "over 91% of the time" (Mem. at 5) and that "only a limited number of customers" experienced disruption in service, for times "no more than an hour and a half." (Mem. at 5 n.8). First of all, harm to a buyer caused by down time can, without more, support a finding that an exclusive remedies clause has failed of its essential purpose. The opinion in <u>International Fin. Servs., Inc. v. Franz</u>, 515 N.W.2d 379 (Minn. Ct. App. 1994), <u>aff'd in part and rev'd on other grounds in part</u>, 534 N.W.2d 261 (Minn. 1995), illustrates this principle well. There, the third-party plaintiff, Franz, purchased photo-plotting equipment for his business from the third-party defendant, Gerber. Gerber warranted that the equipment would produce high-quality photo-plots, and the contract contained a repair-or-replace clause limiting Franz's remedies. The system failed, and Gerber repaired it nineteen times, rendering it inoperable for between 16% and 25% of the time. Franz's business suffered and it fell behind on debt payments. Its creditor, IFSC, sued for payment, and Franz impleaded Gerber for breach of warranty. The jury returned a verdict in favor of Franz, finding that Gerber had breached the implied warranty of merchantability and that the limitation of remedies had failed of its essential purpose. On appeal, Gerber challenged the finding of failure of purpose. While the court recognized that "[a] seller's limited warranty generally does not fail of its essential purpose as long as the seller repairs each problem as it occurs," <u>id.</u> at 385, it does fail "if circumstances arise to deprive the remedy of its meaning or to deprive a buyer of the substantial value of its

13

bargain," id. Gerber argued that Franz had not identified a defect in the product, but the court noted that because the machine was inoperable during Gerber's frequent repairs and the number of malfunctions was unreasonably high, the jury was justified in finding that Franz had been denied the value of its bargain. Id. at 386.

Here, NSTAR Electric purchased the cable in order to meet its firm capacity obligations. In other words, NSTAR Electric was seeking to ensure that even if one of its undersea cables failed, it would have enough capacity to supply Martha's Vineyard's needs at peak demand periods. Insofar as the #99 cable was out of service under Okonite's calculation 10% of the time due to failures and the resulting repairs, NSTAR Electric has been deprived of precisely what it sought in the bargain it made with Okonite, namely a cable that ensured it had the necessary firm capacity. More, to the point, however, the cable has been out of service for extended periods of time each and every time that Okonite was required to repair it. NSTAR Electric serves an entire community with power, including hospital, police and safety workers. A 10% failure rate (even if not understated) is wholly unacceptable, especially for a regulated industry that requires peak demand coverage.

   3.  <u>Destruction Of The Product Is Relevant To Failure Of Essential Purpose.</u>

Okonite also ignores the principle that at the end of the day, after the seller has made its repairs, the buyer must be left with goods that conform to the warranty, else the warranty limitation fails of its essential purpose. As the court in <u>Hadar v. Concordia Yacht Builders, Inc.</u>, 886 F.Supp. 1082, 1099-1100 (S.D.N.Y. 1995) (interpreting Massachusetts law), noted, a limited remedy fails of its essential purpose where the defect has completely destroyed the product. Here, the failures have prompted "repairs" that are themselves expressly nonconforming under the Agreement. Okonite was definitive in its representations to NSTAR when it bid for the

14

contract; ***"The submarine cable will be furnished manhole to manhole without field splices."*** Indeed, in May 1995, Okonite's President wrote with respect to a suggestion that Okonite field splice the first defective cable, ***"[O]ur position is that this is not a viable option. Okonite/Simplex are warranting this cable for ten (10) years and we must make on-size, factory restorations to the cable***." (Folkman Decl. ¶ 5). In reality, what was nonconforming at the start of the Agreement is no less nonconforming today, especially given the fault-intolerant service that NSTAR Electric provides to the citizens of this Commonwealth. It is for the jury to determine whether Okonite's warranty to fail of its essential purpose.

    4.    <u>Okonite Attacks Arguments NSTAR Electric Has Never Made.</u>

Okonite's brief (Mem. at 6) sets up and knocks down a straw man. NSTAR Electric has never suggested that a <u>single</u> failure is enough to overcome an exclusive remedy clause, nor that a failure of the cable alone is enough. Here, the evidence (once it has been developed fully) will show that the very act of repairing the cable damages it, and in any event, the fix (field splices) creates multiple weak points in a system that was <u>expressly</u> promised to be field splice free. Moreover, here the evidence will show that Okonite, despite five attempts over a period of years, has been unable to provide NSTAR Electric with the reliable cable that it promised would have a "long and trouble free life."

    5.    <u>Because The Claim Here Is Novel, Full Development Of The Facts Is Necessary.</u>

Neither party has cited a case in which the buyer has alleged that the warranty has failed of its essential purpose because the repairs themselves, or testing incident to the repairs, were themselves damaging the goods. The issue is novel and can best be decided on a full record. <u>See</u> <u>Virgil v. Time, Inc.</u>, 527 F.2d 1122, 1131 n.15 (9th Cir. 1975) ("Denial … of summary judgment

involves not only pure questions of law; it involves as well an exercise of discretion upon the question whether decision should be postponed until it can be founded on a more complete factual record"); accord Jecies v. Matsuda, 503 F.Supp. 580, 583 (S.D.N.Y. 1980).

C. <u>Okonite Is Not Entitled To Summary Judgment On The Misrepresentation Claims.</u>

Okonite claims on several grounds that it is entitled to summary judgment on NSTAR Electric's claims of fraud and negligent misrepresentation. First, Okonite argues that there is no evidence that its alleged representations were false. Without a fair amount of discovery, however, NSTAR Electric cannot fairly be put to the test. For example, Okonite's repeated representation that its products had a "trouble-free" history is fairly subject to scrutiny, as are Okonite's tests of its product. Certainly Okonite's representation that it had subjected the product to surge tests that "severely stressed the Okoguard insulation system and did not record any failures after over **4-1/2 years of accumulated testing time**" is prima facie at odds with the results of the second CTL report, which revealed that a test involving the circulation of strong currents in the metallic shield caused a hot spot, the formation of a ridge that might be linked to cable failure, and remarkable discoloration. Moreover, NSTAR Electric is not in a position now to say whether the Okonite product has failed in none, one, or many other instances, or to show the circumstances under which Okonite's products have failed. What NSTAR Electric can demonstrate, however, is that Okonite made repeated representations to NSTAR Electric that an Okonite cable would have a long and trouble free life based on Okonite's "unparalleled range of cable manufacturing experience, expertise and facilities." When a party advertises that "One hundred percent reliability is not a goal but reality", that party deserves to have that statement tested in the crucible of discovery.

Okonite next argues that there is no evidence that NSTAR Electric relied on the representations. The declaration of Pamela Szatek flatly contradicts Okonite's argument. Further

undermining Okonite's argument is the fact that every representation referenced in these papers was set forth in Exhibit C to the Agreement. As the Agreement itself states,

> 6.     Entire Agreement
>
> This Contract **and attached Exhibits A – I** represent the entire agreement between the parties…

Agreement, Section I, ¶ 6. (Emphasis added).   (Szatek Decl., Ex. 7).

Seeking to avoid this conclusion, Okonite next claims that NSTAR Electric could not, as a matter of law, rely on its representations because it was a sophisticated party. The case it cites for this remarkable proposition, Sierra Marketing, Inc. v. New Eng. Wholesale Co., 14 Mass.App.Ct. 976 (1982) (rescript), has no bearing on this case. There, Sierra, the seller, sued New England Wholesale, the buyer, for payment on wood stove doors sold and delivered. New England Wholesale counterclaimed for, *inter alia*, violations of c. 93A. The court held that the trial judge had not erred in ruling for Sierra Marketing on the c. 93A claim, because "even if we were to assume that the advertisements at issue were misleading … [o]ur review of the record discloses nothing which demonstrates that the defendants in any way relied to their detriment on those advertisements." Id. at 977. Here, Okonite's representations were not advertisements, but rather statements included in its bid package and specifically incorporated into the Agreement. Second, here, unlike in Sierra Marketing, there is direct evidence of reliance.  See Szatek affidavit. There is no rule of law that prohibits sophisticated entities such as NSTAR Electric from relying on representations made by their vendors, and certainly Okonite has cited none.

Fourth, Okonite argues that NSTAR Electric has suffered no out-of-pocket damages. But the measure of damages in situations such as this is that the plaintiff should have the benefit of his bargain, in this case, a reliable cable, or more precisely the amount of money needed to

17

obtain a reliable cable. See Rice v. Price, 340 Mass. 502, 507 (1960); accord Restatement (Second) of Torts § 549(2) (1977). Thus Okonite's argument fails as a matter of law.

Finally, Okonite argues that the statute of limitations has run on these claims. The discovery rule applies to this case, and it is for the jury to decide when NSTAR knew or should have known that the Cable was inherently at odds with the representations made by Okonite. See Riley v. Presnell, 409 Mass. 239, 247-48 (1991); Clough v. Brown, 59 Mass. App. Ct. 405, 408-09 (2003); Lawton v. TAT Constr. Co., 14 Mass. L. Rptr. 214 (Super. Ct. 2001); Bowen v. Eli Lilly & Co., 408 Mass. 204, 208 (1990) (while plaintiff need not know that the defendant breached a duty to him, statute of limitations does not begin to run until plaintiff has knowledge or sufficient notice of the cause of his injury).

D.     Okonite Is Not Entitled To Summary Judgment On The c. 93A Claim.

Field splices are inferior to factory splices. Okonite knows that. In May 1995, in response to an inquiry from NSTAR Electric concerning the possibility of using field splices, Okonite's president, A.C. Coppola, wrote: "[O]ur position is that this is not a viable option. Okonite/Simplex are warranting this cable for ten (10) years and we must make on-size, factory restorations to the cable." (Folkman Decl. ¶ 5). Okonite promised NSTAR that its cable system would be "furnished manhole to manhole without field splices."

After the first cable failure, Okonite replaced the defective cable with a cable that conformed to the Agreement, i.e., with a cable that had only factory splices. What followed thereafter was very different. In every instance since the second cable was installed, Okonite has insisted on repairing the cables using precisely the components that it promised in the Agreement it would not use. In other words, Okonite defaulted to a known inferior solution because it was economically expedient at the time.

18

An act or practice is unfair under G.L. c. 93A, § 2 if it is "within the penumbra of a common law, statutory, or other established concept of unfairness," or if it is "immoral, unethical, oppressive, or unscrupulous." Morrison v. Toys "R" Us, Inc., 441 Mass. 451, 457 (2004).[4] Okonite's conduct here is certainly within the penumbra of common law fraud. Okonite represented that it would furnish a cable "manhole to manhole without field splices." That representation was consistent with Okonite's refusal to use field splices when the first cable failed. NSTAR Electric relied on Okonite's representation. The reliance was detrimental, since NSTAR Electric now has a cable riddled with field splices that Okonite originally promised would never be installed. Okonite's intent is a matter to be proved at trial. But even if Okonite's intent was wholly innocent, its conduct in light of its representation is nonetheless unfair. Justice Cardozo illustrated this point in the early case of Federal Trade Comm'n v. Algoma Lumber Co., 291 U.S. 67, 81 (1934):[5]

> Competition may be unfair within the meaning of this statute [the FTC Act] and within the scope of the discretionary powers conferred on the [Federal Trade] Commission, though the practice condemned does not amount to fraud as understood in courts of law. Indeed there is a kind of fraud, as courts of equity have long perceived, in clinging to a benefit which is the product of misrepresentation, however innocently made.

---

[4] Although Okonite (Mem. at 15) cites older cases requiring the plaintiff in a § 11 case to prove "a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce," see, e.g., Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 504 (1979), the more recent cases reject the "rascality" standard as unhelpful, and it should not govern here. See Massachusetts Employers Ins. Exc. v. Propac-Mass, Inc., 420 Mass. 39, 42-43 (1995); Damon v. Sun Co., 73 F.3d 1467, 1483 (1st Cir. 1996).

[5] Under G.L. c. 93A, § 2(b), the federal courts' interpretation of the FTC Act guides the interpretation of G.L. c. 93A, § 2(a).

## CONCLUSION

For the foregoing reasons, the Court should deny, or at least defer consideration of, Okonite's Motion for Summary Judgment.

                                              Respectfully submitted,

                                              COMMONWEALTH ELECTRIC CO.,
                                              d/b/a NSTAR Electric
                                              By its attorneys:

                                              /s/ Theodore J. Folkman
                                              Daniel J. Lyne (BBO No. 309290)
                                              Theodore J. Folkman (BBO No. 647642)
                                              HANIFY & KING
                                              Professional Corporation
                                              One Beacon Street
                                              Boston, Mass. 02108
                                              (617) 423-0400

Dated: April 4, 2005
426524