UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH ELECTRIC CO., d/b/a NSTAR ELECTRIC,<br><br>      Plaintiff,<br><br>v.<br><br>THE OKONITE CO.,<br><br>      Defendant. | No. 04-11681-RCL |

**PLAINTIFF'S STATEMENT OF DISPUTED MATERIAL FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, the plaintiff, Commonwealth Electric Co. ("NSTAR Electric"), submits the following statement of material facts. This statement of disputed material facts is without prejudice to NSTAR Electric's right to assert additional disputed material facts following discovery.

The Bid Process And The Contract

1. In April 1994, NSTAR Electric issued a request for quote ("RFQ") on a three-phase 34.5kv armored submarine cable and fiber optic system designed to supply electricity and data transmission services to NSTAR Electric's customers on the Vineyard. (Szatek Decl. ¶ 3).

2. Okonite and a number of other leading cable manufacturers submitted proposals in response to the RFQ. (Szatek Decl. ¶ 4).

3. Okonite's proposal called for lengths of armored cable to be spliced together, rather than using a single run of armored cable. (Szatek Decl. ¶ 5).

4. Okonite also proposed to perform all of the necessary splicing operations at the factory ("factory splices"), rather than splicing the cable together during the cable laying

operation ("field splices"). Factory splices are inherently more reliable than field splices because they are made in a controlled and clean environment. In the course of evaluating the bids, NSTAR Electric provided Okonite with a list of questions. One of the questions was: "Will any Field Splices be required?" Okonite's response was: "*Our proposal offers a unique and effective project installation arrangement having the following benefits: (1) the submarine cable will be furnished manhole to manhole without field splices.*" (Szaetk Decl. ¶ 6).

     5.     Okonite also made numerous other representations in its bid submission that were ultimately incorporated as exhibits into the later contract between NSTAR Electric and Okonite. In its bid, Okonite touted the high reliability of its products. For instance (Szatek Decl. ¶ 7):

    a.  In a document titled "A Short History & Some Facts About the Okoguard System," Okonite represented that its product was "of the highest quality and uniformity in the industry," with an "outstanding track record … in various applications, such as … submarine cable." This "*long, trouble-free in-service record* is unmatched by any other medium-voltage cable system whether it utilizes EP or XLPE as its insulation." (Emphasis added).

    b.  In a document titled "Semiconducting EPR Screens—Smoothness In Perspective," Okonite represented that it had subjected its product to "*continuous testing at four (4) times rated voltage to ground (35kV), and load cycled to 90°C each and every day*," and that the product had "*withstood this severe testing protocol for well over 1100 days without any failure.*"

    c.  In the same document, Okonite represented that it had subjected its product to impulse or switching surge tests, and that the tests "*severely*

>   *stressed the Okoguard insulation system and did not record any failures after over **4-1/2 years of accumulated testing time.***" (Emphasis in the original).
>
>   d.  In the same document, Okonite represented: "The Okoguard all EPR insulation system continues to outperform any and all competitor systems."
>
>   e.  In a document titled "Combined Technologies for Underwater Power Cable Systems," Okonite represented: "*One hundred percent reliability, is not a goal but a reality*."
>
>   f.  In the same document, Okonite represented: "*With over 25 years of service life experience in submarine applications Okoguard provides a balance of properties that include reliability, flexibility, high ampacity rating and retained dielectric strength*."

6. After evaluating the proposed bids, NSTAR Electric selected Okonite (Szatek Decl. ¶ 9).

7. Okonite's representations of reliability were highly material to NSTAR Electric's decision to accept Okonite's bid. Reliability is critical in the electric transmission business. (Szatek Decl. ¶ 10).

8. Had Okonite marketed its cables as having a projected down time of almost 10%, Okonite would not have been chosen for the project. (Szatek Decl. ¶ 10).

9. NSTAR Electric also relied Okonite's acceptance of the ten-year warranty provision that NSTAR Electric had included in the specifications. Pirelli Jacobson, one of the other leading competitors, was unwilling to give a ten-year warranty. (Szatek Decl. ¶ 11).

10. Okonite's representation concerning field splices was also highly material to NSTAR Electric. (Szatek Decl. ¶ 12).

11. On or about August 19, 1994, On or about August 19, 1994, NSTAR Electric entered into a written agreement with Okonite ("the Agreement") for the purchase and installation of a +/- 38,000-foot submarine, land, and optical fiber cable system connecting Falmouth and Martha's Vineyard for a purchase price of $3,122,106.

12. The Agreement obligated Okonite to install the cable in accordance with best construction practice, and to provide NSTAR Electric with a complete and fully operable system at the end of the project. (Szatek Decl. ¶ 15).

13. It also obligated Okonite to provide all necessary materials, supplies, labor, and equipment and to install the cable using "*state of the art methods, procedures, equipment and specifically trained personnel **so that a long period (40 years) of reliable service can be expected***." (Emphasis added). (Szatek Decl. ¶ 16).

14. The Agreement also contained an express warranty provision, that provides, in pertinent part:

> The Contractor [Okonite] warrants to the Company [NSTAR Electric], for a ten (10) year period commencing with the Date of Acceptance ("Warranty Period"), all of the Submarine/Land/Optical Fiber Cable System ("System") from terminal to terminal, **will be free from defects in material and workmanship** provided the System is employed under conditions contemplated and covered by the design specification, and provided further that the System is maintained and operated in accordance with the Contractor's recommended standards and procedures. The Date of Acceptance shall be deemed as that date when successful final Field Acceptance Tests are completed as provided for in the Specifications. (Emphasis added).

(Szatek Decl. ¶ 17).

15. Okonite supplied and installed a cable pursuant to the Agreement. The cable was first energized on May 16, 1995. The Okonite cable is referred to as the #75 cable. (Szatek Decl. ¶ 18).

16. Shortly after installation, the #75 cable failed. On June 30, 2005 Okonite admitted "a cable replacement is required." (Szatek Decl. ¶ 19).

17. Okonite did install the new cable, which NSTAR Electric refers to as the #99 cable. Okonite and NSTAR Electric agreed that NSTAR Electric would have the benefit of a full ten year warranty for the replacement cable, and this ten-year warranty period commenced on December 3, 1996. (Szaetk Decl. ¶ 20).

Chronology of Cable Failures

18. The #99 cable first failed on August 16, 1997, only nine months after installation. More than five thousand NSTAR Electric customers lost power. The outage lasted for more than one hour. (Foley Decl. ¶ 7).

19. The #99 cable next failed on November 25, 1999. Again, more than five thousand NSTAR Electric customers lost power. The outage lasted for more than one-half hour. (Foley Decl. ¶ 8).

20. The #99 cable next failed on October 26, 2003. Nearly four thousand NSTAR Electric customers lost power. The outage lasted for approximately 1.5 hours. (Foley Decl. ¶ 9).

21. The #99 cable failed most recently on March 7, 2004. More than 3,800 NSTAR Electric customers lost power. The outage lasted for more than one hour. (Foley Decl. ¶ 10).

22. Each of the failures occurred at or directly adjacent to one of Okonite's factory splices. After each failure, Okonite "repaired" the #99 cable by cutting out an Okonite factory splice and replacing it with three field splices encased in a "coffin box", or metal box

surrounding the repair. All of the field splices were performed at sea on the deck of a barge. The net result is that the #99 cable, which was intended to consist of cable joined at fifteen factory splices, now consists of eight factory splices and fifteen field splices. (Foley Decl. ¶ 11).

23.     If Okonite had bid a cable that consisted of 65% field splices, it would never have been picked by NSTAR Electric as the successful bidder. (Foley Decl. ¶ 11).

Firm Capacity

24.     Applicable regulations require NSTAR Electric to possess sufficient "firm capacity" to meet the Vineyard's electricity demands. "Firm capacity" means the remaining capacity available after the largest power supply source element supplying the Vineyard is lost. Because of these firm capacity requirements, it was and is critical that NSTAR Electric have a highly reliable source of electricity to its customers, including those on Martha's Vineyard. Prior to installation of the cables at issue in this case, NSTAR Electric's firm capacity for the Vineyard was 27.5 MW. (Foley Decl. ¶ 5).

25.     During the 1990s, electricity consumption increased dramatically on Martha's Vineyard. For example, the peak load (or demand) during the summer of 1995 increased to 36.1 MW. In response, NSTAR Electric determined that it was necessary to install an additional undersea cable from the mainland to the Vineyard. Indeed, without a new undersea cable, NSTAR Electric would have been unable to satisfy demand in the event one of the existing cables failed. NSTAR Electric projected that the situation would become worse as demand on the Vineyard, particularly in the summer months, continued to increase. (Foley Decl. ¶ 6).

26.     NSTAR Electric's firm capacity fell below the amount necessary to meet the peak demand on Martha's Vineyard following one of the four failures. (Foley Decl. ¶ 12).

Effects of Thumping

25. After each of the four failures, Okonite requested that NSTAR localize the fault by "thumping" the cable. Cable faults involve a break in the circuit that carries electricity from one end of the cable to the other. Thumping requires power to be run through the cable at sufficiently high voltage that a charge arcs from one side of the fault to the other. This arc creates a thumping sound that divers are then able to locate. (Dey Decl. ¶ 5).

26. Thumping has more likely than not diminished the expected life-span of the #99 cable. Thumping requires repeated, rapid high-voltage DC current to be run through the cable. This procedure can lead to the accumulation of "space charges" within the cable insulation, which can then discharge, weakening the insulation. (Dey Decl. ¶ 13).

Causation of the Cable Failures

27. While the experts who have sought to determine the cause of the failures seem to agree that the cause has to do with the cable itself, there is a material disagreement as to the source of the failure. On the one hand, one expert points to factors relating to cable assembly, in-factory handling, or installation. On the other hand, another expert point to a design flaw (application of the shield in the opposite direction of lay) and the existence of a hot spot that led to the formation of ridges. An Okonite employee points to yet a third factor, namely a "nick" in the insulation. (Dey Decl. ¶¶ 11-12).

Other Disputed Issues

28. The parties dispute whether the cable was in service for a reasonable or acceptable proportion of the time since its installation. (Compare Okonite's Statement of Undisputed Material Facts ¶ 17 with Szatek Decl. ¶ 15).

29. The parties dispute whether Okonite's representations concerning the reliability of the cable are false, and if so, whether Okonite knew or should have known that they were false.

NSTAR Electric has not had a fair opportunity to discover the facts on this issue. (Lyne Decl. ¶¶ 9-10).

30.  The parties dispute whether Okonite's representations concerning the reliability of the cable were material to NSTAR Electric's decision to contract with Okonite. (Szatek Decl. ¶¶ 10-13).

31.  The parties dispute when NSTAR Electric had sufficient knowledge to trigger the running of the statute of limitations on its claims. NSTAR Electric has not had a fair opportunity to discover the facts on this issue. (Lyne Decl. ¶¶ 9-10).

        Respectfully submitted,

        COMMONWEALTH ELECTRIC CO.,
        d/b/a NSTAR Electric
        By its attorneys:

        /s/ Theodore J. Folkman
        Daniel J. Lyne (BBO No. 309290)
        Theodore J. Folkman (BBO No. 647642)
        HANIFY & KING
        Professional Corporation
        One Beacon Street
        Boston, Mass. 02108
        (617) 423-0400

Dated: April 4, 2005