UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH ELECTRIC
COMPANY, d/b/a NSTAR ELECTRIC,

    Plaintiff,

v.

THE OKONITE CO.,

    Defendant.

No. 1:04-CV-11681(RCL)

## DECLARATION OF PAMELA J. SZATEK

I, Pamela J. Szatek hereby depose and state as follows:

1.    I am the Director of Procurement for NSTAR Electric & Gas Corporation. I have held that position since 1998. Prior to that time I was Manager of Purchasing for Commonwealth Electric Company ("NSTAR Electric").

2.    As Director of Procurement, I am responsible for the timely and accurate delivery of supply chain services to the Company's operating areas. This position ensures the implementation and execution of sound purchasing, inventory management, processes and procedures. The position also ensures that supply management activities consistently meet internal customer requirements while achieving the lowest total cost and best value for the acquisition of materials and services. I have a Bachelor of Science degree in Business Management from the University of Massachusetts in Dartmouth, Massachusetts. I am also a member of the Institute for Supply Management (ISM), Purchasing Management Association of Boston (PMAB) and am a Board Member for the New England Minority Supplier Development Council (NEMSDC).

3. In April 1994, Commonwealth Electric Company issued a Request for Quote ("RFQ"), on a three-phase 34.5kv armored submarine cable and fiber optic system designed to supply electricity and data transmission services to NSTAR Electric's customers on the Vineyard.

4. Okonite, as well as a number of other leading cable manufacturers, including the Kerite Co. and Pirelli Jacobson, Inc., submitted proposals in response to the RFQ.

### Okonite's Bid

5. Okonite's proposal called for lengths of armored cable to be spliced together, rather than using a single run of armored cable.

6. Okonite also proposed to perform all of the necessary splicing operations at the factory ("factory splices"), rather than splicing the cable together during the cable laying operation ("field splices"). Factory splices are inherently more reliable than field splices because they are made in a controlled and clean environment. In the course of evaluating the bids, NSTAR Electric provided Okonite with a list of questions. One of the questions was: "Will any Field Splices be required?" Okonite's response was: "*Our proposal offers a unique and effective project installation arrangement having the following benefits: (1) the submarine cable will be furnished manhole to manhole without field splices.*" A true copy of Okonite's response is attached to this Declaration as Exhibit 1.

7. Okonite also made numerous other representations in its bid submission that were ultimately incorporated as exhibits into the later contract between NSTAR Electric and Okonite. In its bid, Okonite touted the high reliability of its products. For instance:

    a. In a document titled "A Short History & Some Facts About the Okoguard System," Okonite represented that its product was "of the highest quality

and uniformity in the industry," with an "outstanding track record … in various applications, such as … submarine cable." This "*long, trouble-free in-service record* is unmatched by any other medium-voltage cable system whether it utilizes EP or XLPE as its insulation." (Emphasis mine). A true copy of this document is attached to this Declaration as Exhibit 2.

b. In a document titled "Semiconducting EPR Screens—Smoothness In Perspective," Okonite represented that it had subjected its product to "*continuous testing at four (4) times rated voltage to ground (35kV), and load cycled to 90°C each and every day*," and that the product had "*withstood this severe testing protocol for well over 1100 days without any failure*." A true copy of this document is attached to this Declaration as Exhibit 3.

c. In the same document, Okonite represented that it had subjected its product to impulse or switching surge tests, and that the tests "*severely stressed the Okoguard insulation system and did not record any failures after over **4-1/2 years of accumulated testing time**.*" (Emphasis in the original).

d. In the same document, Okonite represented: "The Okoguard all EPR insulation system continues to outperform any and all competitor systems."

e. In a document titled "Combined Technologies for Underwater Power Cable Systems," Okonite represented: "*One hundred percent reliability, is

3

*not a goal but a reality.*" A true copy of this document is attached to this Declaration as Exhibit 4.

    f.    In the same document, Okonite represented: "*With over 25 years of service life experience in submarine applications Okoguard provides a balance of properties that include reliability, flexibility, high ampacity rating and retained dielectric strength.*"

8. Okonite made additional representations concerning the outstanding reliability of its product. Other such representations are noted in NSTAR Electric's Answers to Interrogatories (at ¶ 31), which is attached to this Declaration as Exhibit 5.

9. After evaluating the proposed bids, NSTAR Electric selected Okonite.

<u>NSTAR Electric's Reliance</u>

10. Okonite's representations were highly material to NSTAR Electric's decision to accept Okonite's bid. Reliability is critical in the electric transmission business. I have reviewed some of the papers Okonite has submitted to the Court in connection with its motion for summary judgment. Okonite argues that the cable at issue in this case has "operated as intended over 91% of the time," which of course is inadequate level of reliability. Had Okonite marketed its cables as having a projected down time of almost 10%, I believe that Okonite would not have been chosen for the project.

11. NSTAR Electric also relied on Okonite's acceptance of the ten-year warranty provision that NSTAR Electric had included in the specifications. (Pirelli Jacobson, one of the other leading competitors, was unwilling to give a ten-year warranty). Attached to this Declaration as Exhibit 6 is a true copy of a bid evaluation report prepared by Harold W. Eklund, an engineer, which highlights the importance of the warranty to NSTAR Electric.

12. The representation concerning field splices was also highly material to NSTAR Electric. See Declaration of Swapan Dey, submitted herewith.

13. NSTAR Electric relied on all of Okonite's representations in deciding to contract with Okonite.

14. On or about August 19, 1994, NSTAR Electric entered into a written agreement with Okonite ("the Agreement") for the purchase and installation of a +/- 38,000-foot submarine, land, and optical fiber cable system connecting Falmouth and Martha's Vineyard for a purchase price of $3,122,106. A true copy of excerpts of the Agreement is attached to this Declaration as Exhibit 7.

## The Agreement and Installation of the Cable

15. The Agreement obligated Okonite to install the cable in accordance with best construction practice, and to provide NSTAR Electric with a complete and fully operable system at the end of the project.

16. It also obligated Okonite to provide all necessary materials, supplies, labor, and equipment and to install the cable using "*state of the art methods, procedures, equipment and specifically trained personnel **so that a long period (40 years) of reliable service can be expected**.*" (Emphasis added).

17. The Agreement also contained an express warranty provision, that provides, in pertinent part:

> The Contractor [Okonite] warrants to the Company [NSTAR Electric], for a ten (10) year period commencing with the Date of Acceptance ("Warranty Period"), all of the Submarine/Land/Optical Fiber Cable System ("System") from terminal to terminal, ***will be free from defects in material and workmanship*** provided the System is employed under conditions contemplated and covered by the design specification, and provided further that the System is maintained and operated in accordance with the Contractor's recommended standards and procedures. The Date of Acceptance shall be deemed as that

5

date when successful final Field Acceptance Tests are completed as provided for in the Specifications. (Emphasis added).

18.     Okonite supplied and installed a cable pursuant to the Agreement. The cable was first energized on May 16, 1995. The Okonite cable is referred to as the #75 cable.

19.     Shortly after installation, the #75 cable failed.  On June 30, 2005 Okonite admitted "a cable replacement is required."

20.     Okonite did install the new cable, which NSTAR Electric refers to as the #99 cable.  Okonite and NSTAR Electric agreed that NSTAR Electric would have the benefit of a full ten year warranty for the replacement cable, and this ten-year warranty period commenced on December 3, 1996.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 4, 2005.

/s/ Pamela J. Szatek<br>Pamela J. Szatek

427164