UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH ELECTRIC
COMPANY, d/b/a NSTAR ELECTRIC,

        Plaintiff,

    vs.

THE OKONITE CO.,

        Defendant

Civ. A. No. 1:04-CV-11681-RCL

## COMMONWEALTH ELECTRIC COMPANY, d/b/a NSTAR ELECTRIC'S ANSWERS TO INTERROGATORIES PROPOUNDED BY THE OKONITE CO.

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, the plaintiff, Commonwealth Electric Company, d/b/a NSTAR Electric ("NSTAR Electric"), responds as follows to the interrogatories propounded by the defendant, The Okonite Co. ("Okonite").

### GENERAL OBJECTIONS

NSTAR Electric objects to these interrogatories to the extent they call for information protected by the attorney-client privilege or the work product rule. NSTAR Electric also objects to Definition 2 to the extent it imposes obligations greater than those imposed by Local Rule 26.5 and to Definition 6 to the extent it fails to identify all documents that are part of the Contract. NSTAR Electric also objects to these interrogatories to the extent they are premature and reserves the right to supplement its responses after undertaking further discovery.

### RESPONSES

1.    Identify all documents or statements that you contend comprise the

contract between NSTAR Electric and Okonite concerning the 1996 cable that you contend Okonite breached.

Response.    Objection. The definition of "identify" in Local Rule 26.5(C)(4), which requires the answering party to name the addressees and recipients of the document to be identified and to identify the type of document and its general subject matter, should not apply to this interrogatory. Subject to this objection, NSTAR Electric responds as follows. The following documents comprise the contract between NSTAR Electric and Okonite concerning the defective cable:

A.    The document labeled "Commonwealth Electric Company," "Section 1 – Contract," dated February 8, 1995, executed by James J. Keane on behalf of Commonwealth Electric Company and William D. Turner on behalf of Okonite.

B.    The document labeled "General Terms and Conditions – Section 2," dated October 21, 1994, drafted by Pamela J. Szatek.

C.    The document labeled "Request for Quotation," attached to the contract as Exhibit A, dated April 21, 1994 and executed by Robert A. Doyle on behalf of Commonwealth Electric Company.

D.    The document attached to the contract as Exhibit B, which comprises the following documents:

1.    The document labeled "Bidding Instructions," dated April 19, 1994, drafted by Harold W. Eklund;

2.    The document labeled "Specification No: 1-0494," dated April 19, 1994, drafted by Harold W. Eklund;

3.    The document labeled "Specification No: 2-0494," dated April 19, 1994, drafted by Harold W. Eklund;

4.    The document labeled "Specification No: 3-0494," dated April 19, 1994, drafted by Harold W. Eklund;

5.    The document labeled "Specification No: 4-0494," dated April 19, 1994, drafted by Harold W. Eklund; and

6.    The document labeled "Specification No: 5-0494," dated April 19, 1994, drafted by Harold W. Eklund.

E.    A letter from John P. Bachhuber to Pamela J. Szatek dated July 1, 1994, with attachments, attached to the contract as Exhibit C, concerning Okonite's proposal to NSTAR.

F.    The document labeled "Proposal Questions," drafted by an employee or agent of NSTAR, attached to the contract as Exhibit D, concerning NSTAR Electric questions for Okonite.

G.    A letter from John P. Bachhuber to Harry Eklund and William Gill dated July 29, 1994, attached to the contract as Exhibit E, concerning Okonite's responses to questions posed by Mr. Gill.

H.    A letter from Robert A. Doyle to John Bachhuber, dated August 3, 1994, attached to the contract as Exhibit F, concerning NSTAR Electric questions for Okonite.

I.    A letter dated August 12, 1994, from John P. Bachhuber to Robert A. Doyle, with attachments, attached to the contract as Exhibit G, concerning Okonite's responses to NSTAR's questions.

J.    The document labeled "Purchase Order Number CV31889N," executed by Robert Doyle, dated September 29, 1994, addressed to Okonite, attached to the contract as Exhibit H.

K.    The form of a letter from NSTAR Electric to John P. Bachhuber, concerning acceptance, attached to the contract as Exhibit I.

2.    Detail how Okonite purportedly breached its express or implied warranties and/or the Contract or any agreement between NSTAR Electric and Okonite, setting forth all the facts upon which you may rely to provide your contention that Okonite breached its express or implied warranties and/or the Contract or any agreement between NSTAR Electric and Okonite.

<u>Response.</u>    Objection. This interrogatory is impermissibly vague because the scope of the word "detail" is unclear. NSTAR Electric also objects to the extent this interrogatory seeks all the facts upon which it "may" rely, since NSTAR Electric expects to discover additional admissible facts in pre-trial discovery and therefore cannot now state all of the facts on which it may rely in the future. Subject to these objections, NSTAR Electric responds as follows.

Okonite breached its express warranty because within ten years of the Date of Acceptance (as that term is defined in the warranty provision of the General Terms and Conditions), it became evident that there were defects in the material or workmanship that cause several cable failures. Indeed, Okonite recognized this fact when it undertook to repair each of those failures at no cost to NSTAR Electric. Okonite also breached its warranty to perform the work in a good, acceptable, and workman-like manner. While the exact nature of this breach awaits further clarification in discovery, NSTAR Electric's position is that had the work been performed acceptably, the cable failures would not have occurred.

Okonite also breached its implied warranties. As a merchant with respect to undersea cables, Okonite implicitly warranted that the good were merchantable. In this case, the cable was failed several times in or around the splice locations, indicating that

the cable was not fit for the ordinary purpose for which an undersea cable is used and that the cable would not pass without objection in the trade. Okonite also had reason to know the particular purpose for which NSTAR Electric was purchasing the cable, namely, as an undersea cable in the Vineyard Sound. Okonite therefore also implicitly warranted that the cable was fit for that purpose. In light of the several failures, which Okonite has repaired at its cost, it is apparent that the cable was not in fact fit for its intended purpose.

Okonite breached the contract by failing to provide NSTAR Electric with what it promised, namely, a Submarine, Land & Optical Fiber Cable System capable of providing reliable electricity and fiber-optic service to Martha's Vineyard.

3.    State the basis for the allegation contained in Paragraph 1 of the Complaint that "[u]nder the terms of the Agreement, Okonite promised, *inter alia,* to provide NSTAR Electric with a cable system 'free of defects,' and to perform all work under the Agreement in a 'good, acceptable and workman like manner.'"

Response.    The General Terms and Conditions provide: "The Contractor warrants that it shall use new first-class materials throughout, and warrants that it shall perform the work in a good, acceptable and workman like manner." The General Terms and Conditions also provide: "The Contractor warrants to the company, for a ten (10) year period commencing with the Date of Acceptance ("Warranty Period"), all of the Submarine/Land/Optical Fiber Cable System ("System") from terminal to terminal, will be free from defects in material and workmanship provided the System is employed under conditions contemplated and covered by the design specifications, and provided further that the System is maintained and operated in accordance with the Contractor's recommended standards and procedures."

4.    State the basis for the allegation contained in Paragraph 6 of the

Complaint that "Okonite's proposal repeatedly represented that its cables were of the highest quality."

Response.    In the letter of July 1, 1994 to Pamela Szatek, attached to the contract as Exhibit C, John P. Bachhuber wrote: "We are also confident that we have provided proposals which will ensure Commonwealth Electric with a system of the highest quality and reliability."  Engineering Note 90-7, dated June 15, 1990, which is part of Exhibit C to the Contract, reads: "Additionally, the use of statistical process control and inspection procedures have been put in place so that today the Okoguard cables produced by Okonite are of the highest quality and uniformity in the industry. This is borne out by the outstanding track record of the Okoguard system in various applications, such as nuclear and fossil plants, submarine cable, and all types of industrial applications."

5.    State the basis for the allegation contained in Paragraph 1 of the Complaint that "[e]ach of these failures was caused by cable defects."

Response.    Objection. This interrogatory calls for expert opinion evidence. NSTAR Electric has not yet identified a testifying expert. NSTAR Electric will provide an expert report stating the basis for its allegation that the failures were caused by cable defects in accordance with the applicable Rules of Civil Procedure and the case management schedule in this action.

6.    State the basis for the allegation contained in Paragraph 7 of the Complaint that "Okonite proposed a System that included splices because Okonite lacked the technology to produce a continuous run of cable of the length required for the System."

Response.    NSTAR Electric is informed and believes that Okonite was incapable of producing a continuous run of cable of sufficient length because of constraints on its manufacturing and assembly processes.

7.      Identify all companies other than Okonite that submitted proposals in response to Commonwealth Electric Co.'s Request for Proposal, dated April 1994.

Response.      The following companies, in addition to Okonite, submitted

proposals: (1) Kerite Co.; (2) Pirelli Jacobson, Inc.; (3) Cablec Utility Cable Co.; and (4)

Joy Electrical Co., Inc.

8.      State the basis for the allegation contained in Paragraph 8 of the Complaint that "Okonite represented that the proposed splices would tie the individual cable lengths together flawlessly, and that the splices would not degrade the System or diminish the life expectancy of the System in any material respect."

Response.      During the course of contract negotiations, representatives of

Okonite represented to NSTAR Electric that the proposed factory splices that it would

use to assemble the cable would have no adverse effect on the life expectancy or

performance of the cable.

9.      State the basis for the allegation contained in Paragraph 9 of the Complaint that "[t]his representation [that all of the necessary splicing operations be performed at the factory, rather than splicing the cables together during the cable laying operation] was important to NSTAR Electric because factory splices are performed in a controlled and clean environment."

Response.      It is common knowledge in the industry that while it is preferable

to have a cable without splices, factory splices are preferable to field splices, because

factory splices are performed in a controlled environment where workmanship errors are

less likely, and where there is a diminished risk of defects associated with site or

environmental conditions. Insofar as reliability was of prime importance to NSTAR,

NSTAR Electric relied on Okonite's representation that the splicing would be performed

in the controlled environment of its factory.

10.      Identify all the individuals involved in or in attendance at the August 19, 1994 meeting mentioned in Paragraph 10 of the Complaint.

Response.      Objection. The scope of the phrase "involved in" is unclear.

Subject to this objection, NSTAR Electric states that the following persons were in attendance at the August 19, 1994 meeting: William Gill, James Keane, John Bachhuber, Harold Eklund, Greg Fontaine, Kate Castle, Thomas Neyhart, David Logan, David Irish, William Turner, James Fitzgerald, and James Caldwell.

11.    State the basis for the allegation contained in Paragraph 10 of the Complaint that "[p]rior to and during the meeting, Okonite repeatedly represented that field splices would not be required at any location in the System, and that the cable circuit requirement would be supplied in one continuous length tied with factory splices only."

Response.    At no time during this project did Okonite propose using field splices or a continuous-run cable with no splices. Both Okonite and NSTAR Electric have always understood that only a limited number of factory splices would be used, and that no field splices would be required. Indeed, in the contract itself (Ex. G, p. 14), Okonite represented that "the submarine cable will be furnished manhole to manhole without field splices."

12.    State the basis for the allegation contained in Paragraph 11 of the Complaint that "on or about August 19, 1994 NSTAR Electric and Okonite entered into an agreement ... for the purchase and installation of a +/- 38,000-foot submarine, land and optical fiber cable system connecting Falmouth, MA and Martha's Vineyard, MA for a purchase price of $3,122,106."

Response.    The Contract states: "This Contract entered into this 19th day of August, 1994, by and between Commonwealth Electric Company, hereinafter called the 'Company,' and The Okonite Company, hereinafter called the 'Contractor.'"

13.    State the basis for the allegation contained in Paragraph 12 of the Complaint that "[t]he Agreement obligated Okonite to install the System using state of the art methods, procedures, equipment and specifically trained personnel such that a long period (40 years) of reliable service could be expected."

Response.    The Contract states: "The installation of the submarine cable shall be accomplished by state of the art methods, procedures, equipment, and specifically

trained personnel so that a long period (40 years) of reliable service can be expected."

14.    Identify and describe all the "oral and written representations and warranties" by Okonite, as referenced in Paragraph 14 of the Complaint.

Response. Objection. NSTAR Electric objects to this objection on the grounds

that it is overly broad and unduly burdensome. Okonite may have made oral

representations or warranties to NSTAR Electric or its employees or agents that NSTAR

Electric has not yet discovered in the course of its internal investigation. The

interrogatory is unduly burdensome because Subject to these objections, NSTAR

Electric responds as follows.

Okonite's written warranties are at pp. 1 and 9 of the General Terms and

Conditions and p. 30 of Exhibit B to the Contract. Okonite's written representations may

be derived or ascertained from the Contract documents themselves, and pursuant to Rule

33(c), the burden of cataloguing Okonite's representations is the same for Okonite as for

NSTAR Electric.

15.    State the basis for the allegation contained in Paragraph 17 of the Complaint that "[t]he first three failures occurred in the transition zone between the factory splice and the Cable. The most recent failure occurred within the splicing enclosure and adjacent to a field splice installed by Okonite during the course of a November 2003 repair to a faulty factory splice. Thus, both the nature and location of these failures are indicative of a defect in the design, manufacture and/or installation of both the original factory splices and the replacement field splices."

Response.    Objection. This interrogatory calls for expert opinion evidence

insofar as it seeks information concerning the inferences to be drawn from the nature

and location of the failures. NSTAR Electric has not yet identified a testifying expert.

NSTAR Electric will provide an expert report stating the basis for its allegations in

accordance with the applicable Rules of Civil Procedure and the case management

schedule in this action. Subject to this objection, NSTAR Electric states that tests and

investigations conducted after each failure show that the failures occurred in the areas

alleged in Paragraph 17 of the

Complaint.

16.     State the basis for the allegation contained in Paragraph 18 of the Complaint that the 1996 cable "originally had 15 factory splices" and "now has 23 splices, of which 8 are original factory splices and 15 are field splices that are bunched in unstaggered pairs of three inside of coffin boxes."

Response.     NSTAR Electric understands that the 1996 cable as originally

supplied by Okonite included 15 factory splices, and as a result of Okonite's subsequent

repair efforts now has 23 splices. Of these 23 splices NSTAR Electric understands from

information submitted by or on behalf of Okonite that eight are original factory splices,

and 15 are field splices bunched in unstaggered pairs of three inside coffin boxes.

17.     If you contend that the field splices are inferior in any way to the factory splices, state the basis for your contention.

Response.     Objection. This interrogatory calls for expert opinion evidence.

NSTAR Electric has not yet identified a testifying expert. NSTAR Electric will provide

an expert report stating the basis for its allegation that the failures were caused by cable

defects in accordance with the applicable Rules of Civil Procedure and the case

management schedule in this action.

18.     State the basis for the allegation contained in Paragraph 19 of the Complaint that "[t]he System failures have resulted in significant interruptions of service to NSTAR's customers, and caused NSTAR and its customers to incur extraordinary expenses associated with responding to these failures, and in purchasing replacement power."

Response.     Objection. NSTAR Electric objects to this interrogatory insofar as

it calls for information concerning expenses incurred by NSTAR Electric's customers.

NSTAR Electric expects to obtain such information in the course of pre-trial discovery

and will supplement its response as required. Subject to this objection, NSTAR Electric responds as follows.

     A.     <u>August 16, 1997 Failure.</u> 5,177 customers lost service for approximately 83 minutes. The incident caused 7,162 customer outage hours. NSTAR Electric reserves the right to supplement this response with additional information about its costs.

     B.     <u>November 25, 1999 Failure.</u> 5,375 customers lost service for approximately 35 minutes. The incident caused 3,135 customer outage hours. NSTAR Electric reserves the right to supplement this response with information about its costs.

     C.     <u>October 26, 2003 Failure.</u> 3,988 customers lost service for approximately 91 minutes. The incident caused 4,429.4 customer outage hours. NSTAR Electric incurred out-of-pocket expenses for labor, materials, third-party contracts, and generation totaling $144,735.59.

     D.     <u>March 7, 2004 Failure.</u> 3,834 customers lost service for approximately 70 minutes. The incident caused 4,473 customer outage hours. NSTAR Electric incurred out-of-pocket expenses for labor, materials, third-party contracts, and generation totaling $48,623.01.

     19.     Describe (including dates and length and number of customers affected) all outages or interruptions in service experienced as result of the Splice Failures, including what alternative means of delivering electricity, if any, were used during the outages or interruptions in service.

     <u>Response.</u>     NSTAR Electric incorporates its response to Interrogatory 18. Further answering, NSTAR Electric states that it responded to the cable failures by using both additional on-Island generation and by adding load to other existing submarine cables.

     20.     Describe and identify all the testing referenced in Paragraph 20 of the

Complaint.

Response.    NSTAR Electric incorporates its response to interrogatory 21 and

states that it conducted "thumper" tests in connection with fault location after each of the

four cable failures.

21.    State the basis for the allegations contained in Paragraph 20 of the
Complaint that "[t]he testing required NSTAR Electric to run high voltages through the
Cable lessening the Cable's useful life." In responding to this interrogatory, state the
basis for both parts of the allegation: (1) that the testing required NSTAR Electric to run
high voltages through the Cable and (2) that such testing allegedly lessened the Cable's
useful life.

Response.    Objection. The second sub-part of this interrogatory calls for

expert opinion evidence. NSTAR Electric has not yet identified a testifying expert.

NSTAR Electric will provide an expert report stating the basis for its allegation that the

thumper test lessened the cable's useful life in accordance with the applicable Rules of

Civil Procedure and the case management schedule in this action.

Subject to this objection, NSTAR Electric answers the first subpart of the

interrogatory as follows. NSTAR Electric localized the faults in the cable by having

performed  a "thumper" test. In this test, which was performed with Okonite's

knowledge and acquiescence, high-voltage direct current was run through the cable. The

test caused an arc of electricity to travel from the location of the fault into the earth. The

voltage was required to be high enough both to cause an arc and to cause such a strong

arc that a loud sound would result. This sound allowed personnel, including divers, to

localize the fault.

22.    State the basis for the allegation contained in Paragraph 1 of the

Complaint that "additional repairs would not provide NSTAR with an as-warranted

cable system."

<u>Response.</u>        Objection. This interrogatory calls for expert opinion evidence.

NSTAR Electric has not yet identified a testifying expert. NSTAR Electric will provide

an expert report stating the basis for its allegation that the additional repairs would not

provide NSTAR Electric with an as-warranted cable system in accordance with the

applicable Rules of Civil Procedure and the case management schedule in this action.

23.     State the basis for the allegation contained in Paragraph 1 of the
Complaint that "NSTARis left with a defective cable system that cannot be relied upon
to provide critical electric and data transmission capacity to Martha's Vineyard."

<u>Response.</u>        Objection. This interrogatory calls for expert opinion evidence.

NSTAR Electric has not yet identified a testifying expert. NSTAR Electric will provide

an expert report stating the basis for its allegation in accordance with the applicable

Rules of Civil Procedure and the case management schedule in this action. Subject to

this objection, NSTAR Electric states that given the history of cable failures, and given

NSTAR Electric's obligations to its regulators and customers to provide an

uninterrupted supply of electricity to Martha's Vineyard, NSTAR Electric cannot

reasonably rely on the cable, particularly in times of peak demand.

24.     State the basis for the allegation contained in Paragraph 1 of the
Complaint that "[r]epeated repair work has weakened the cable and diminished its life
expectancy."

<u>Response.</u>        Objection. This interrogatory calls for expert opinion evidence.

NSTAR Electric has not yet identified a testifying expert. NSTAR Electric will provide

an expert report stating the basis for its allegation that the failures were caused by cable

defects in accordance with the applicable Rules of Civil Procedure and the case

management schedule in this action.

25.     State the basis for the allegation contained in Paragraph 21 of the
Complaint that "continued testing, cable raising, and field splicing will inevitably result

in further damage and loss of useful life to an already defective System."

    <u>Response.</u>        Objection. This interrogatory calls for expert opinion evidence.

NSTAR Electric has not yet identified a testifying expert. NSTAR Electric will provide

an expert report stating the basis for its allegation that the failures were caused by cable

defects in accordance with the applicable Rules of Civil Procedure and the case

management schedule in this action.

    26.    State the basis for the allegation contained in Paragraph 23 of the
Complaint that "[i]nstead of a System that was reasonably expected to remain in
operation for forty or more years, NSTAR Electric is left with a defective System that
cannot be adequately repaired."

    <u>Response.</u>        Objection. This interrogatory calls for expert opinion evidence.

NSTAR Electric has not yet identified a testifying expert. NSTAR Electric will provide

an expert report stating the basis for its allegation that the failures were caused by cable

defects in accordance with the applicable Rules of Civil Procedure and the case

management schedule in this action.

    27.    State the basis for Nstar's contention that the 1996 cable was reasonably
expected to remain in operation for forty or more years, as alleged in Paragraph 23.

    <u>Response.</u>        NSTAR's experience is that in general, undersea cables can be

expected to last approximately forty years. NSTAR Electric uses a forty-year life to

calculate depreciation on the cable for accounting purposes, and NSTAR Electric

believes that this measure of lifespan is reasonable given its experience in the industry.

Moreover, as stated in the response to Interrogatory 13, Okonite also represented that the

cable could be expected to last for forty years.

    28.    State the basis for the allegation contained in Paragraph 32 of the
Complaint that "[t]he goods Okonite sold to NSTAR Electric pursuant to the Agreement
were not of merchantable quality insofar as they would not pass without objection in the
trade under the contract description."

Response.    A cable that is of such defective workmanship that it fails on multiple occasions within a few years of installation would not "pass without objection in the trade," since no buyer would willingly accept such a cable.

29.    State the basis for the allegation contained in Paragraph 33 of the Complaint that "[t]he goods Okonite sold to NSTAR Electric pursuant to the Agreement were not merchantable insofar as they were not fit for the ordinary purposes for which such goods are used." (¶33).

Response.    The cable Okonite sold to NSTAR Electric has failed on several occasions due to a defect in its design or construction. NSTAR Electric believes that a cable properly designed and constructed would not repeatedly fail as has occurred in the case of this cable.  Therefore, the cable was not fit for the purpose for which it would ordinarily be used, namely, to provide an continuous supply of electricity..

30.    State the basis for the allegation contained in Paragraph 37 of the Complaint that "NSTAR was relying on [Okonite's] skill or judgment to select or furnish suitable goods."

Response.    Okonite is a merchant in undersea cables, and holds itself to the market as a merchant in such goods. Okonite also represented itself in its proposal and other documents included in the Contract to have many years of experience and much expertise in undersea cable design, manufacture, and installation. Any buyer would be entitled to rely on Okonite's touted experience and expertise. Indeed, these factors are a prominent consideration in the decision to enter into a costly sales contract. NSTAR Electric would not have contracted with a seller that lacked the skill or judgment necessary to advise it concerning the most suitable goods for accomplishing the task contemplated in the request for proposals.

31.    Identify every statement or representation that NSTAR Electric claims that Okonite made to NSTAR Electric in connection with the 1996 cable that is false.

<u>Response.</u>       Objection. NSTAR Electric objects to this objection on the grounds that it is overly broad and unduly burdensome. Okonite may have made oral statements or representations to NSTAR Electric or its employees or agents that NSTAR Electric has not yet discovered in the course of its internal investigation. Subject to this objection, NSTAR Electric responds that the following statements or representations are false or misleading.

A.       "The Okoguard system has performed flawlessly in a multiplicity of applications and in various types of installations, i.e., submarine cables, direct burial, conduit, trays, etc." (Ex. C, p. 43).

B.       "Additionally, the use of statistical process control and inspection procedures have been put in place so that today the Okoguard cables produced by Okonite are of the highest quality and uniformity in the industry. This is borne out by the outstanding track record of the Okoguard system in various applications, such as nuclear and fossil plants, submarine cable, and all types of industrial applications." (Ex. C, p. 48).

C.       "This long, trouble-free in-service record is unmatched by any other medium-voltage cable system whether it utilizes EP or XLPE as its insulation." (Ex. C, p. 48).

D.       "Both of the above independent test programs severely stressed the Okoguard insulation system and did not record any failures after over **4-1/2 years of accumulated testing time.**" (Ex. C, p. 53).

E.       "The Okoguard insulation system has proven itself in independent accelerated testing, but equally important is the on-going service record in all

environments and in all applications from 5 thru 69kV for over twenty-five (25) years."
(Ex. C, p. 54).

     F.     "The Okoguard all EPR insulation system continues to outperform any
and all competitor systems." (Ex. C, p. 54).

     G.     The representations that the Orangeburg facility was "state-of-the art"
and that its "closed loop system assures cleanliness." (Ex. C, pp. 55, 58).

     H.     "One hundred percent reliability, is not a goal but a reality." (Ex. C, p.
63).

     I.     "With over 25 years of service life experience in submarine applications
Okoguard provides a balance of properties that include reliability, flexibility, high
ampacity rating and retained dielectric strength."

     J.     "With a wealth of design, engineering and management talent; an
unparalleled range of cable manufacturing experience, expertise and facilities; and an
extensive complement of installation equipment, the Okonite/Simplex/Caldewll's team
can provide installed submarine power cable systems to meat any need."

     K.     "Simplex SL Double Armor (DA) Communication Cable is designed for
the most rugged shallow water applications where cables cannot be buried." (Ex. C, p.
114).

     L.     "The Fiber Optic Cables offered for use on this project are current
submarine cable designs that are qualified by AT&T for high reliability transoceanic
telecommunications service. Over 80,000 kilometers of these cables are in operations
and give testimony to the reliability and performance characteristics of these designs."

     32.     State the basis for the allegation Paragraph 46 of the Complaint that the
alleged representations that "[t]he Okonite [insulation] system has performed flawlessly

in a multiplicity of applications and in various types of installations, i.e., submarine cables..." and that "[w]ith over twenty-five years of service life experience in submarine applications, Okonite provides a balance of properties that include reliability, flexibility, high capacity rating and retained dielectric strength" were false.

      <u>Response.</u>      Objection. This interrogatory calls for expert opinion evidence.

NSTAR Electric has not yet identified a testifying expert. NSTAR Electric will provide

an expert report stating the basis for its allegation in accordance with the applicable

Rules of Civil Procedure and the case management schedule in this action.

      33.      State the basis for the allegation in Paragraph 47 of the Complaint that the representations that "[t]he Okonite [insulation] system has performed flawlessly in a multiplicity of applications and in various types of installations, i.e., submarine cables..." and that "[w]ith over twenty-five years of service life experience in submarine applications, Okonite provides a balance of properties that include reliability, flexibility, high capacity rating and retained dielectric strength" were "material to NStar's decision to accept Okonite's proposal."

      <u>Response.</u>      Reliability is of central importance to NSTAR, which as a utility

company has commitments to its customers and obligations to regulators that depend on

its ability to deliver adequate supplies of electricity to customers and otherwise to meet

its obligations to them. Therefore, Okonite's representations concerning the reliability of

its product were material to NSTAR's decision to purchase the product. Okonite's

representations about the features of the product such as reliability, flexibility, high

capacity rating, and retained dielectric strength, were also material to NSTAR Electric

because NSTAR Electric was seeking to purchase a cable with those properties, among

others.

      34.      State the basis for the allegation in Paragraph 48 of the Complaint that "Okonite made the representations [that '[t]he Okonite [insulation] system has performed flawlessly in a multiplicity of applications and in various types of installations, i.e., submarine cables..." and that "[w]ith over twenty-five years of service life experience in submarine applications, Okoguard provides a balance of properties that include reliability, flexibility, high ampacity rating and retained dielectric strength'] with knowledge of their falsity for the purpose of inducing NSTAR Electric to enter into

the Agreement.

Response.    NSTAR Electric has pleaded Okonite's knowledge and intention

generally as permitted by Mass. R. Civ. P. 9(b). NSTAR Electric intends to seek to

obtain additional evidence of Okonite's knowledge and intent through pre-trial

discovery.

35.    State the basis for the allegation in Paragraph 49 of the Complaint that
"NStarrelied" on the representations that "[t]he Okonite [insulation] system has
performed flawlessly in a multiplicity of applications and in various types of
installations, i.e., submarine cables..." and that "[w]ith over twenty-five years of service
life experience in submarine applications, Okonite provides a balance of properties that
include reliability, flexibility, high capacity rating and retained dielectric strength" "to
its detriment."

Response.    NSTAR Electric relied on the cited representations because they

were factors that played a role in NSTAR's decision to enter into the contract with

Okonite. Had Okonite not represented that its product performed so well or that it was so

reliable, NSTAR Electric would have taken account of the absence of such

representations. NSTAR's reliance was to its detriment because Okonite's

representations were false, and the cable Okonite sold to NSTAR Electric has failed on

several occasions, leaving NSTAR Electric with a defective cable that must be replaced

at great expense.

36.    Identify every third party that you have consulted at any time concerning
any of the Splice Failures or the quality or life expectancy of the 1996 cable, and
identify all documents that relate to such consultations, including, but not limited to,
reports or summaries of such consultations.

Response.    Objection. NSTAR Electric objects to this interrogatory to the

extent it seeks disclosure of the identity of any consulting expert NSTAR Electric has

engaged in connection with this litigation. NSTAR Electric also objects insofar as the

scope of "documents that relate to such consultations" is unclear. Subject to these

objections, NSTAR Electric has consulted with the following third parties, and the

following reports or summaries of such consultations are related to those consultations:

      A.     Cable Technology Laboratories, Inc., 690 Jersey Ave., New Brunswick,

N.J. 08903, (732) 846-3133. CTL produced a report titled "Assessment of the

Conditions of a 35 kV Factory Made Submarine Joint," dated June 3, 2004. The main

investigator was V. Yaroslavskiy, and the recipient was NSTAR. CTL also produced a

report titled "Failure Analysis of a 35 kV Factory Made Submarine Joint," dated March

17, 2004. The main investigator was V. Yaroslavskiy, and the recipient was NSTAR.

      B.     NSTAR Electric is in the process of determining whether it consulted

with other third parties and will supplement this response as required.

     37.     Identify your ten largest customers each year since 1994.

    <u>Response.</u>     Objection. This interrogatory calls for information that is

irrelevant and not likely to lead to the discovery of admissible evidence.

     38.     Provide a detailed accounting and description of the damages you allege
NSTAR Electric suffered as a result of the Splice Failures or any of the purported
wrongful acts and omissions of Okonite as described in the Complaint, including but not
limited to its alleged breach of warranty (express or implied), breach of contract,
misrepresentation (negligent or intentional), or unfair or deceptive trade acts or
practices.

    <u>Response.</u>     The measure of NSTAR's damages, exclusive of any multiple

damages, attorney's fees, costs or interest recoverable in this action, is the cost of

replacement of the defective cable, which NSTAR Electric estimates to be $4.5 million,

plus the out-of-pocket costs noted in the response to Interrogatory 18.

The foregoing answers are made on behalf of Commonwealth Electric Company ("NSTAR Electric"), and not the undersigned individual, who is signing in her representative capacity. The information contained therein is derived from multiple sources within and available to NSTAR Electric, and NSTAR Electric believes such information to be true. By signing below under penalties of perjury the undersigned intends solely to meet NSTAR Electric's obligations under Rule 33 of the Federal Rules of Civil Procedure and does not represent that she has personal knowledge of the information contained therein.

    I declare under penalty of perjury that the foregoing is true and correct. Executed on January 24, 2005.

Pamela J. Szatek

As to objections:

Daniel J. Lyne (BBO No. 309290)
Theodore J. Folkman (BBO No. 647642)
HANIFY & KING, P.C.
One Beacon Street
Boston, Mass. 02108
(617) 423-0400

Dated: January 24, 2005

421985