UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH ELECTRIC CO., d/b/a
NSTAR ELECTRIC,

    Plaintiff,

v.

THE OKONITE CO.,

    Defendant.

No. 1:04-CV-11681-RCL

## DECLARATION OF SWAPAN K. DEY

Swapan K. Dey deposes and says as follows:

1. My name is Swapan K. Dey. I am an engineer employed by NSTAR Electric, the plaintiff in this action. My title is Director, Substation Engineering. I have held this position since May 2002.

2. I joined NSTAR Electric in 2002. Prior to joining NSTAR, I served as Manager of the Substation and Transmission Engineering Div. of KeySpan (formerly Long Island Lighting Company). During the last twenty-nine years of my professional career, I have been involved with design, engineering, and construction of fossil and nuclear power plants, distribution, transmission, and substations. From January 1993 to December 1994, I served as an electric utility advisor for the EPRI Underground Transmission Task Force. I am a working group member of various committees including the Submarine Cable Committee of the Insulated Conductor Committee of IEEE and Electric Power Apparatus Committee of AEIC.

3. I make this Declaration solely in opposition to the defendant's ("Okonite's") motion for summary judgment. NSTAR Electric expressly reserves the right to alter or amend the opinions contained herein based upon subsequent discovery and expert analysis.

### The Location and Cause of the #99 Cable Failures

4. Okonite's underwater cable, now known within NSTAR Electric as the #99 cable, runs between Falmouth and Martha's Vineyard. The #99 cable has failed in four separate locations at four separate times since its installation in 1996.

5. After each failure, Okonite requested that NSTAR Electric locate the fault by using a capacitor discharge device (also known as a "thumper"). Cable faults introduce a breach in the cable insulation system. The "thumper" applies a capacitor discharge signal and then detect the signal from the fault using a listening device. The "thumper" applies high voltage DC to the cable insulation to create a discharge.

6. The #99 cable is not a single, continuous cable running from Falmouth to Martha's Vineyard, but rather, several shorter lengths of cable spliced together prior to delivery to form a single cable. According to Okonite, the #99 submarine cable was intended to be furnished manhole to manhole without field splices. However, the #99 cable was originally constructed 15 factory splices (in five groups of three).

7. Assuming they are done correctly, factory splices are acknowledged as superior to field splices because they are performed in a controlled factory environment. Field splices, on the other hand are done in an open environment. In the case of submarine cables, field splices are done on the deck of barge as cable is installed or repaired.

8. Each of the four failures in the #99 cable occurred adjacent to one of Okonite's factory splices. With respect to the first three cable failures, Okonite repaired the cable by cutting

away the factory splice and typically replacing it with two field splices along with additional cable between the field splices.  The most recent failure occurred at one of Okonite's replacement field splices, which then had to be cut away and replaced along with additional cable between the field splices.  As a result, the #99 cable, which originally had fifteen factory splices (five splices in each phase times three phases in one circuit), now has only eight original factory splices, but an additional thirteen field splices, six of which are replacements for field splices that have themselves failed after only a few months in service.  Attached to this Declaration as Exhibit 1 is a chart showing the splice situation.

        9.       In a submarine cable system, the use of splices generally add potential weakness in the electrical insulation and the mechanical integrity of the cables.  For that reason, cable systems are designed to contain the fewest possible number of splices. As a result of the repeated failures, the #99 cable now has almost twice as many splices as was originally envisioned, two-thirds of which are field splices. Each of those fifteen field splices represent an inherently weak point in the #99 cable because every one of them was performed on the deck of a barge in the middle of Vineyard Sound, exposed to varying weather and ocean current conditions, as opposed to in a controlled factory environment.

        10.      It is important to note that the issue of field splices was so important to NSTAR Electric that NSTAR Electric's original bid specification stated: "*It is expected that the submarine cable circuit requirement shall be supplied in one continuous length without field splices.*" When NSTAR Electric received Okonite's bid, Robert A. Doyle, a Senior Technical Buyer for NSTAR predecessor Commonwealth Electric Company, wrote to John P. Bachhuber, Okonite's District Manager, asking "*Will any field splices be required?*" Mr. Bachhuber responded, "*The submarine cable will be furnished manhole to manhole without field splices.*"  A

3

true copy of the correspondence between Mr. Doyle and Mr. Bachhuber is attached to this Declaration as Exhibit 2.

11.    Employees and consultants retained by both sides have reached different conclusions regarding the precise cause of the cable failures, although all agree that the failures all occurred at or directly adjacent to one of Okonite's splices.

    a. One Okonite employee, A.F. Angelone, has opined with respect to one of the failures that "*somebody must have nicked the insulation while ring-cutting and removing the original jacket.*" The only personnel who would have been involved in such a procedure would be an Okonite employee or agent.

    b. Consultants retained by both parties after failures have advanced various theories regarding the cause of one or more of the failures. Okonite commissioned a report from Stephen Turner of USi in March 2000 regarding the November 1999 cable failure. A true copy of this report is attached to this Declaration as Exhibit 3. Turner opined, "*the fault may have occurred due to an electrical discontinuity in the shield assembly; perhaps due to cable assembly, in factory handling or during installation.*" Mr. Turner also noted, "*staining of the insulation in the area of the fault.*" He concluded that this staining "*resulted from water entering through the polyethylene jacket as a result of the fault.*" Interestingly, this very same type of staining was observed in another Okonite submarine cable that failed prior to the #99 cable. ("*A similar type stain was observed in Okogard insulation from the Fox Island Co-op 35 kv submarine cable, and sulfur was found present in the stained area.*" (See Okonite report dated January 10, 2000 attached as Ex. 4).

4

    c.   NSTAR Electric retained Cable Technology Laboratories, Inc. ("CTL") as consultants. CTL prepared two reports, dated March 17, 2004 and June 3, 2004, respectively. True copies of these reports are attached to this Declaration as Exhibits 5 and 6. CTL reported apparent manufacturing defects in the area of the cable failure: "*defects most likely causing the cable failures are the ridges on the cable metallic shield, which deeply protrude into the extruded insulation shield and leave indents on the insulation.*" It suggested that these ridges may have occurred because, "*the joint metallic shield was applied in the opposite direction of lay, as compared to the original cable shield. Such design,*" CTL suggested, "*could facilitate partial unwinding of copper tapes during thermo-mechanical deformations, resulting in looseness of the tapes and, finally, in creating the ridges.*" In a second report after additional testing, CTL ran currents up to 50 amperes in the metallic shield of the sample of the cable. CTL found that while a majority of the cable length had a jacket temperature of 19°C after two hours, a hot spot located next to the joint (or splice) had a temperature of 30.8°C. A dissection of the faulted splice revealed that the copper tape in the area of the hot spot was "*remarkably discolored*" and that "*a number of imperfections on the metallic shield,*" including a ridge, were found around the joint area. CTL reaffirmed its conclusion that "*the most likely reason for the in-service failures was looseness of the cable metallic shield resulting in the development of sharp ridges on the shield, harming the outer layers of the cable insulation syste*m."

12.    It is clear from the above reports that, while both sets of investigators appear to find fault with the Okonite cable, there is a material disagreement as to the source of the failure.

On the one hand, Mr. Turner points to factors relating to cable assembly, in-factory handling, or installation. On the other hand, the CTL reports point to a design flaw (application of the shield in the opposite direction of lay) and the existence of a hot spot that led to the formation of ridges. Mr. Angelone points to yet a third factor, namely a "nick" in the insulation.

<u>The Effect of Thumping The Cable and Adding Field Splices</u>

13.     In my opinion, repeated thumping has more likely than not diminished the expected life-span of the #99 cable system. Thumping requires repeated, rapid high-voltage DC to be impressed on the cable. This procedure can introduce weakness into an already weakened insulated cable system.

14.     The present #99 cable circuit contains two different types of splices: (1) flexible factory splices, and (2) field splices.[1] Factory splices, if performed properly, will allow a submarine cable system to deploy a longer length of cable by avoiding splicing operation at sea. Since the factory splices are performed by staggering the individual phase splices by 25 to 50 feet, the cable protective sheath and armor can be applied continuously thereby avoiding splices of the sheath and armors. Continuous lead boundary provides total environmental protection and the continuous armor provides improved mechanical protection of the cable. Also, the factory splices are performed in a properly controlled environment and using stable conditions. The repair splices performed during the #99 cable installation breached the cable lead boundary and the continuity of the armors. The repair splices on the cable #99 were performed on the cable repair barge in continuously changing sea weather conditions. During the repair splice construction, the components of the cable system, e.g., conductor, conductor shield, insulation, insulation shield, lead sheath, armor, etc., were reconstructed to complete the repair work. The

---

[1] There is a distinction between "field splices" performed incident to installation of a cable and field splices, also known as "repair splices," performed incident to a cable repair. What are labeled as "field splices" in this Declaration are of the latter kind.

6

extra length of cable that was added to join the old cable with the new one may also add a changed condition compared to the original unaltered condition.  The quality of the splices depends on a proper vessel positioning system, cable tensioning equipment capable of holding the cable steady during splicing, and proper splice over-boarding methodology.  From the evidence of both factory splice and repair splice failures, it is obvious, and it is my professional opinion, based on my experience, education, and training, that the excessive number of repair splices have rendered the #99 cable unreliable, unpredictable, and unsuitable for a properly functional continuous power supply to Martha's Vineyard.

    I declare under penalty of perjury that the foregoing is true and correct. Executed on April 4, 2005.

                                              /s/ Swapan K. Dey
                                              Swapan Dey

427302