UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH ELECTRIC<br>COMPANY D/B/A NSTAR ELECTRIC,<br><br>                Plaintiff,<br><br>vs.<br><br>THE OKONITE COMPANY,<br><br>                Defendant. | Civil Action No. 04-cv-11681-RCL |

**THE OKONITE COMPANY'S REPLY TO PLAINTIFF'S OPPOSITION TO
THE OKONITE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

Defendant The Okonite Company ("Okonite") submits this Reply to respond to four specific issues raised by Plaintiff The Commonwealth Electric Company d/b/a NStar Electric ("NStar") in its Opposition to The Okonite Company's Motion for Summary Judgment ("NStar's Opposition," or "NStar Opp." in citations), as well as to point out two relevant issues NStar failed to address, as outlined in Okonite's Motion for Leave to File Reply Brief.

**I.    The Cause of the Breakdowns is Irrelevant Because Okonite Satisfied the Exclusive
Remedy Provision, Which Therefore Did Not Fail of Its Essential Purpose.**

NStar claims it requires discovery as to the cause of the four breakdowns of the cable at issue in this lawsuit (the "Cable") before the Court can decide Okonite's Motion for Summary Judgment ("Okonite's Motion"). NStar Opp. at 10, 11. Indeed, NStar spends a whole page detailing various theories about the cause of the breakdowns. *Id.* at 7-8. Nowhere, however, does NStar explain *why* discovery on this issue or resolution of this issue is needed. Rather, all that NStar states is that "[i]t is impossible to say whether the warranty limitation provision has failed of its essential purpose until the cause of the failures … are fairly the subjects of

discovery." NStar Opp. at 11. NStar provides no legal authority for this proposition, nor does it provide any explanation. These omissions are not surprising for there is *no* legal reason that the cause of the breakdowns must be determined before deciding whether the exclusive remedy provision failed of its essential purpose in this case. Indeed, the law in this area ***presupposes*** that the cause of the product's failure is a defect in breach of the warranty because the issue of what remedy the buyer is entitled to arises *only if* there is a defect in breach of the warranty. Thus, even if the cause of the breakdowns is shown to be an Okonite-caused defect (which is the best outcome NStar could obtain through discovery), the exclusive remedy provision negotiated and agreed to by these sophisticated commercial entities dictates that the *only* remedy is repair or replacement. That remedy provision governs unless it fails of its essential purpose. *See, e.g., Ag-Chem Eq. Co. v. Limestone Farmers Coop.*, 567 So.2d 250, 251 (Ala. 1990).[1] As such, the only question is whether the exclusive remedy provision – which NStar consistently omits - failed of its essential purpose, a determination that does not include an analysis of the cause of the breakdowns given that they were repaired.

As the cases addressing whether an exclusive remedy fails of its essential purpose make clear, the only questions for determining whether the exclusive remedy provision fails of its essential purpose are (1) whether the seller repaired the product within a reasonable time and (2) whether the product actually worked after repair. *See* cases cited in Okonite's Mem. at 8. *See also Myrtle Beach Pipeline Corp. v. Emerson Electric Co.*, 843 F. Supp. 1027, 1043 (D.S.C. 1993)(collecting cases holding that there is no failure of essential purpose where seller provides timely repair). The answer to both prongs is an undisputed yes.

---

[1] *Ag-Chem* is, in fact, quite instructive: the plaintiff in that case, as in this case, claimed that the product could never satisfy the warranty if it were simply repaired and, therefore, it was entitled to a wholly new product. The Court summarily rejected that argument, *even though there was actual testimony on the issue*, because under the warranty, the seller was entitled to repair the product. *Id.* at 252.

There is no dispute that Okonite promptly responded to reports of breakdowns and willingly repaired the Cable. In all cases Okonite responded *immediately* to NStar's report of failure and set to fixing it. Fitzgerald Aff. at ¶24. NStar does not provide any evidence to the contrary. *See, e.g., Lankford v. Rogers Ford Sales*, 478 S.W.2d 248 (Tex. Ct. App. 1972) (granting summary judgment where seller repaired product every time it failed); *Dowty Comm., Inc. v. Novatel Comp. Sys. Corp.*, 817 F. Supp. 581 (D. Md. 1992)(granting summary judgment where buyer failed to present any evidence that seller was unwilling to repair). There is, likewise, no factual dispute as to the amount of time that the Cable was out of service.[2] Lastly, there is also no dispute that the Cable worked after each repair, i.e. it has carried the amount of electricity it was intended to carry.[3] As such, the only issue is whether Okonite repaired the Cable within a reasonable time. The Court can decide this issue in Okonite's favor as a matter of law on the present record. *See, e.g., Delmarva Power & Light Co., v. ABB Power T&D Co., Inc.*, 2002 WL 840564, *5-6 (Del. Super.)(finding, in factually similar case, that uncontested length of downtime for complicated product not unreasonable as a matter of law and holding that "[w]hat is a reasonable period of time to correct defects will vary according to the type of product involved and complex machinery such as that involved in this litigation reach toward the extreme

---

[2] The Cable has been operational from energization in December 1996 to the present (3,065 days as of April 28, 2005) except for 264 days of downtime due to the splice failures. This calculation is based on the dates of breakdown set forth in Plaintiff's Statement of Disputed Material Facts in Opposition to Defendant's Motion for Summary Judgment ("NStar's Statement of Facts") at ¶¶18-21, which dates Okonite accepts for purposes of this motion, and the repair dates set forth in the Second Affidavit of James V. Fitzgerald ("Fitzgerald Aff. II") at ¶2. Though NStar baldly intimates that Okonite's calculation of downtime may be wrong, NStar Opp. at 14, nowhere does it provide any *facts* disputing Okonite's calculation, as it must in accordance with Local Rule 56.1.

[3] In this regard, there is no validity to NStar's bald claim that it requires discovery about the reason why Okonite "decided" to repair rather than replace the Cable given that it replaced the original cable that was laid in 1995, NStar Opp. at 10. NStar fails to explain why this question is relevant given that the repairs resulted in a working cable, and there is no reason: because the parties' contract permits *either repair or replacement*, the issue of which remedy Okonite chose is immaterial to any genuine issue in this case as long as the remedy chosen gives NStar a working cable. *See, e.g., Ag-Chem Eq. Co.*, 567 So.2d at 252 (where exclusive remedy is repair *or* replacement, buyer cannot demand only replacement). Moreover, the reason for the difference is clear and uncontested: Okonite determined, and NStar well knows, that the defect in the original cable was such that that cable could never carry its intended

of that spectrum"); *Riegel Power Corp. v. Voith Hydro*, 888 F.2d 1043 (granting summary judgment despite significant, undisputed amount of downtime); *Rheem Mfg. Co. v. Phelps Heating & Air Condition, Inc.*, 746 N.E.2d 941, 952-554 (Ind. 2001)(granting summary judgment despite significant downtime over four years).[4]

Lastly, NStar argues that the Court should deny Okonite's Motion because "the issue of whether a warranty has failed of its essential purpose is *typically* a factual issue that must be determined by the jury." NStar Opp. at 12 (emphasis added). The issue is not, however, *always* a factual issue that needs to go to a jury, as shown by the cases cited in Okonite's Memorandum in Support of its Motion for Summary Judgment ("Okonite Memorandum" or "Okonite's Mem." in citations) at 10-11.[5] *See also Delmarva Power & Light Co.,* 2002 WL 840564 (granting summary judgment in factually similar case); *Intrastate Piping & Controls, Inc. v.*

---

electrical load; on the other hand, with the splice replacements, the Cable could and did carries its intended electrical load. Fitzgerald Aff. II at ¶3. As such, no discovery is needed on this issue.

[4] NStar's reliance on *Internat'l Fin* Servs*, Inc. v. Franz*, NStar Opp. at 13, is misplaced. In that case, the buyer's business *failed* as a result of the downtime, 515 N.W.2d 379 (Minn. Ct. App. 1994), a situation not even remotely comparable to this case.

[5] NStar's attempts to distinguish the three cases Okonite cited for this proposition, NStar Opp. at 12-13, are beside the point. The factual distinctions NStar notes were not the bases for the court's granting of summary judgment in those cases. Thus, for example, in *Riegel Power*, the court ignored the issue of the warranty period and instead held that "the real issue in the case … was whether the lost time in operation of the turbine … was such that in a commercial sale such as this one it could be said that the exclusionary remedy … had failed 'its essential purpose" and based its decision on the facts that the seller responded promptly and the product worked after each repair. 888 F.2d at 1045-47. In any event, each case Okonite cited does stand for the proposition that a court can grant summary judgment even where the parties dispute whether the exclusive remedy provision failed of its essential purpose. On the other hand, NStar has not pointed to a single case in which court denied summary judgment where the seller attempted repairs and the product worked for substantial periods after repair, as occurred in this case.

In this regard, the cases cited by NStar, NStar Opp. at 12, are inapposite. In *Piper Jaffrey*, the product *never* worked properly and thus the court *assumed* failure of essential purpose, 54 UCC Rep. Serv. 2d 1088 (D. Minn. 2004), and in *Sosik v. Albino Marine, Inc.*, despite repeated repairs, the boat was usable for only "relatively few hours," 2003 WL 21500516 (Mass. Sup. Ct.). In *Laidlaw Transp. Inc. v. Helena Chem. Co.*, the court did not even address whether there was a factual issue concerning the failure of essential purposes. 680 N.Y.S.2d 365 (N.Y. App. Div. 1998). And, in *Rheem Mfg.*, the parties *agreed* for this part of the case that the exclusive remedy provision had failed of its essential purpose. 746 N.E.2d at 946 & 946 n.4. *Rheem* is notable, however, for its clear pronouncements that in accordance with the purpose of the U.C.C., "[s]ophisticated commercial actors should be free to allocate risks as they see fit, and courts should not interfere simply because such risks have materialized," *id.* at 950-951, and for the fact that the court *granted* summary judgment as to another exclusive remedy provision in the parties' contract, even though the product had experienced significant downtime over four years, *id.* at 952-955.

*Robert-James Sales, Inc.*, 315 Ill. App. 3d 248, 257-258 (2000)(granting summary judgment and finding no failure of essential purpose, as a matter of law, where seller readily repaired product, which then worked); *Myrtle Beach Pipeline Corp.*, 843 F. Supp. at 1042-46 (finding no failure of essential purpose as a matter of law, especially because it was a commercial transaction between two sophisticated commercial entities). In short, the Court can and should grant summary judgment to Okonite on this record because there are no *genuine* issues as to the *material* facts.

II. **NStar's Theoretical Claims about the Cable's Future Life Are Premature, and NStar Has Failed to Bring Forth Evidence to Raise a Genuine Issue of Fact.**

NStar argues that the repairs themselves have shortened what NStar expected to be the Cable's life and that NStar, thus, requires discovery on the issue of the longevity of the Cable.

Not only does NStar not have a contractual basis for its argument, *see* Okonite's Mem. at 10, but overall its claim is legally unfounded and premature. As of today, the Cable works: it is undisputed that it carries the electrical load it was designed to carry. Whether the Cable will or will not continue to work sometime in the future, therefore, is pure speculation or conjecture, not objective fact. NStar cannot, and has offered no legal authority that it can, maintain a claim *now* based on the theory that sometime in the *future* the Cable *may* cease working. Rather, NStar can bring such a claim only when, if ever, the Cable actually ceases to work as intended.[6]

Moreover, NStar should not be permitted to hide behind the case management schedule to force Okonite to go through months and thousands of dollars of fact discovery on this issue when NStar has not put forth in its Opposition even a single piece of admissible *factual* evidence to show that the repairs themselves or the fault location or repair processes diminished the life of the Cable. As the plaintiff, NStar has the obligation to put forth the *factual basis* for its position

---

[6] This point is made clear by these questions: Will Okonite be able to recoup any part of a judgment that NStar might receive on this aspect of its claim if the Cable is still working some significant amount of time after the ten-year warranty period? if it is stilling working after NStar's self-designated forty-year period?

5

in order to defeat the motion for summary judgment. Fed. R. Civ. P. 6(e)("adverse party's response … must set forth *specific facts* showing that there is a genuine issue for trial" (emphasis added)). As such, NStar's argument that it has no obligation to put forth its *factual basis* until after fact discovery because its allegation is the subject of *expert opinion* makes no sense.[7]

Lastly, there is no legal basis for finding a breach of contract due to any alleged diminution in the life of the Cable as long as it lasts the length of the warranty. *See* Okonite's Mem. at 9-10. NStar's only response to Okonite's argument is that there is a statement contained in NStar's Request for Bid that the company awarded the contract should install the cable using "state of the art methods, procedures, equipment and specifically trained personnel so that a long period (40 years) of reliable service can be expected." NStar Opp. at 5-6. This argument fails as a matter of law (and, therefore, no factual discovery is required) because Section 2 of the parties' contract (the "Contract"), the General Terms and Conditions, unambiguously provides that "[t]o the extent that a conflict as to the meaning of the terms and conditions contained herein and any of the other specifications may exist, then these General Terms and Conditions shall govern." Exh. A to Kramer Aff., at Section 2, §18.0, at OK00292. Accordingly, the provision quoted by NStar is overridden by the conflicting and *express* ten-year warranty contained in the General Terms and Conditions. That warranty represents the allocation of risk upon which these sophisticated commercial entities agreed after negotiation. As such, even if NStar puts forth evidence that the Cable might not last forty years, such evidence will not result in liability to

---

[7] There are, for example, various types of objective, factual evidence that could form the factual basis of NStar's claims, such as the results of a standard "aging" tests, i.e. an AC breakdown test or a tensile and elongation test on the parts removed from the Cable during all repairs subsequent to the first one, all of which NStar should have possessed before bringing this action and none of which are the subject of expert opinion. Since NStar produced no such evidence, Okonite is entitled to argue that none exists. Indeed, that NStar put forth no such evidence in opposition to Okonite's motion speaks volumes. In this regard, Okonite did not "wrongly claim" that NStar has failed to put forth any evidence, as NStar argues, NStar Opp. at 10 n.3. The interrogatory unambiguously requested that NStar "state the basis" for its allegations that the Cable has been diminished. The phrase "state the basis" is defined in the local rules as requiring the disclosure of documents, communications, and *facts*, among other things, that form the basis of the specific allegation. Local Rule 26.5(C)(8).

Okonite as long as the Cable continues to work within the ten-year warranty period, i.e. December 2006.

### III. The Contract Does Not Prohibit Field Splices.

Now, long after Okonite has performed repairs with field splices at a cost to itself of more than NStar paid for the Cable, repairs of which NStar not only knew but in which NStar participated, NStar raises a brand new argument that the Contract itself prohibits the use of field splices to repair the Cable. Even if there were any validity to this argument, the resolution of the issue would not necessitate any discovery – Okonite readily admits that it performed field splices. Thus, the only question is an interpretation of the unambiguous language of the Contract. The Court can find as a matter of law that nothing prohibits field splices in repairs.[8]

NStar's entire argument that the Contract "expressly prohibits Okonite from ever using field splices," NStar Opp. at 8,[9] even as a repair option, is based solely on the following language from NStar's request for bids and Okonite's response to certain questions during the bidding process: "It is expected that the submarine cable circuit requirement shall be supplied in one continuous length without field splices," NStar Opp. at 6,[10] and "The submarine cable will be furnished manhole to manhole without field splices," NStar Opp. at 3, 5.

---

[8] As such, NStar's reliance on the proposition that a repair-or-replacement clause fails where the defect "has completely destroyed the product," NStar Opp. at 14, is irrelevant. The field splices are not "expressly nonconforming," as NStar claims, *id.*, and the Cable undeniably continues to work and is not destroyed.

[9] Insofar as the remainder of the quoted sentence suggests that the Agreement says anything about field splices being "inherently inferior," it is misleading: the Contract is devoid of any such statement, as evidenced most clearly by the fact that NStar nowhere points to one. Indeed, NStar's entire argument that field splices are inherently inferior is based solely on the opinion of its own employees, none of whom provide any written documentation supporting their opinions.

[10] NStar omitted the following language from the same page: "The benefit of this approach is that the cable remaining on the barge, after the installation is complete, will be the spare cable required by Commonwealth Electric and sized as the 3/C 500 MCM. In this case, the spare cable can be easily used in the future for emergency repairs …. The spare splice kit will include connectors for both 500 MCM to 500 MCM or 350 MCM to 500 MCM cable sizes." Exh. 1 to Szatek Decl., at OK00240. While the details of this passage are immaterial, overall it is significant because of (1) the complete absence of any suggestion that the reason for the factory splices is their relative quality and (2) the mention of the spare cable to be used in field splices. *See* Fitgerald Aff. II at ¶4.

7

Interpretation of unambiguous contract language is a question of law for a court to decide. *See, e.g, Lexington Ins. Co. v. All Regions Chemical Labs, Inc..,* 419 Mass. 712, 713 (1995); *Coll v. PB Diagnostic Systems, Inc.,* 50 F.3d 1115, 1122 (1st Cir.1995). The question of whether the contract is ambiguous is itself a question of law. *See, e.g., ITT Corp. v. LTX Corp.*, 926 F.2d 1258, 1261 (1st Cir. 1991). In this case, the quoted language is unambiguous: It clearly and unequivocally discusses what will be ***supplied*** and ***furnished*** to NStar. That is exactly what Okonite did: it ***supplied*** and ***furnished*** a cable without field splices in one continuous length. There is no dispute about this fact. *See* NStar Opp. at 18 ("After the first cable failure, Okonite replaced the defective cable with a cable *that conformed to the Agreement, i.e., with a cable that had only factory splices*." (Emphasis added.)). To borrow from the First Circuit, NStar, "whatever its hopes and expectations, is not entitled to insist that the provision be tortured into something totally different from what it says." *ITT Corp.*, 926 F.2d at 1263.

Lastly, a contract must be interpreted as a whole, giving reasonable, lawful, and effective meaning to all its provisions and a court must avoid reading out any portions. *See, e.g.*, *Trustees of Boston College v. Big East Conference*, 18 Mass. L. Rptr. 177, *5 (Sup. Ct. 2004)(van Gestel, J.). Accordingly, NStar's interpretation fails because it essentially reads out the option of repair from the Contract. The *only* way to repair a submarine cable that has been laid under a substantial body of water, as the Cable was, is through a field splice; the Cable cannot be lifted and returned to the factory for a factory splice (and, indeed, NStar would never want such a result). As such, NStar's interpretation would render the actual *express* language permitting "*repair or* replacement" meaningless. Furthermore, in its Bid, which NStar claims is part of the Contract, Okonite specifically included a diagram and description of the field splices that would

8

be included in case of a necessary repair, thus proving conclusively that the Contract provided for the use field splices. Exh I, attached to Fitzgerald Aff. II.

Therefore, all of NStar's various arguments based on Okonite's use of field splices fail as a matter of law.

### IV. **NStar's Bald Allegations that It Relied on Statements Concerning Reliability Do Not Meets Its Burden.**

NStar's bald allegations that it relied on the marketing material contained in Okonite's bid are insufficient to defeat Okonite's Motion. The entirety of NStar's evidence that NStar relied on the stated representations and promises is the statement by Pamela Szatek in her affidavit that it was *her belief* that NStar relied on Okonite's statements concerning the Cable's longevity and quality. NStar Opp. at 5 (citing only to Szatek Decl. ¶10.) Her *belief* is not a fact upon which a trier of fact can decide in favor of NStar on this issue. Moreover, what was not said is telling. Ms. Szatek nowhere states that she *knows* that anyone at NStar relied on Okonite's statements, she nowhere states that *she* relied, she nowhere offers the name of even one decisionmaker who *actually* relied. Indeed, nowhere does NStar offer the type of evidence that would be necessary to show reliance, such as evidence that anyone with decisionmaking authority even read those specific statements before awarding Okonite the contract. *Cf. Fleet Nat. Bank v. H&D Entertainment, Inc.*, 96 F.3d 532, 540 (1st Cir. 1996)(holding that conclusory affidavit of one of defendant's principals was not sufficient to create any genuine issue of material fact such as might preclude entry of summary judgment, where affidavit did not recite any specific facts such as names, dates, or actual statements to support its assertion). The absence of these types of specific evidence shows NStar's allegations for what they are: weak attempts to conjure up a claim to avoid the consequences of the Contract it negotiated.

**V.      NStar Does Not Address Limitation on Consequential and Incidental Damages and Provides No Evidence on Statute of Limitations.**

In Section IV of the Memorandum, Okonite argues that the limitation of liability provision contained in the Contract is enforceable and serves to bar not only NStar's claims of consequential or incidental damages, but also NStar's whole 93A claim. Okonite's Motion at 2-3; Okonite Mem. at 17-20. NStar fails to respond to this argument, and, thus, the Court should grant Okonite's Motion on this issue.

Okonite also argues that the statute of limitations bar certain claims. Okonite Mem. at 14. Although NStar cites to cases setting out the standard for accrual of the claim, it provides no evidence to counter Okonite's evidence that NStar actually knew of what it now alleges are problems well before the limitations period ended. NStar Opp. at 18; *see also* NStar's Statement at ¶31 (offering only conclusion and failing to provide any *facts* in support of its position). Given that there is no genuine dispute that NStar actually knew all the relevant facts, there is nothing for the jury to decide. Therefore, the Court can grant summary judgment on this issue as a matter of law.

## CONCLUSION

For the foregoing reasons and the reasons set forth in Okonite's Memorandum, Okonite requests that the Court enter summary judgment for Okonite on all counts.

THE OKONITE COMPANY,
By its attorneys,

 /s/ Andrea C. Kramer
Robert E. Sullivan, BBO # 487820
    sulli@swmlawyers.com
Andrea C. Kramer, BBO #632584
    akramer@swmlawyers.com
Sullivan Weinstein & McQuay, P.C.
Two Park Plaza, Suite 610
Boston, MA  02116-3902
617-348-4300

Dated:  April 28, 2005