UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH ELECTRIC CO., d/b/a NSTAR ELECTRIC,<br><br>　　　　Plaintiff,<br><br>v.<br><br>THE OKONITE CO.,<br><br>　　　　Defendant. | No. 04-11681-RCL |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO STAY DISCOVERY**

The Defendant, Okonite Co. ("Okonite") has gone to great lengths to shield any and all discovery into the cause of the multiple submarine cable failures that lie at the core of this case. It has moved (without merit) for summary judgment. It has repeatedly refused to produce documents. NSTAR Electric has now obtained documents from a third party that demonstrate that Okonite is actively hiding documents. Okonite's position is not simply without merit; it is sanctionable.

BACKGROUND

NSTAR Electric provides electricity service to Martha's Vineyard. NSTAR Electric provides service in two ways. First, it generates small amounts of electricity using on-island generators. Second, it transmits electricity from the mainland via undersea power cables. Prior to the installation of the cables at issue in this case, NSTAR Electric had two submarine cables running from mainland Massachusetts to Martha's Vineyard.

NSTAR Electric is required by applicable regulations to maintain sufficient "firm capacity" to meet projected demand. "Firm capacity" refers to the remaining capacity available after the largest power supply source element supplying a given locus is lost. In the early 1990s,

demand for electricity on Martha's Vineyard increased dramatically. By the summer of 1995, Island peak demand reached 36.1 MW, substantially more than NSTAR Electric's firm capacity at the time. NSTAR Electric therefore issued a Request for Quote ("RFQ") for a new power cable in April 1994. Okonite bid for the cable project. Okonite's bid called for lengths of armored cable to be spliced together, rather than for use of a single run of armored cable. Okonite proposed to perform all of the necessary cable splicing at a factory rather than splicing the cable during the cable-laying operation. Okonite represented, in response to an NSTAR Electric inquiry, that it would furnish a cable "without field splices."

Okonite also made multiple written representations, ultimately incorporated into the contract between Okonite and NSTAR Electric, which touted the reliability of its product.[1] For instance:

- Okonite represented that its product had a "*long, trouble-free in-service record.*" (Emphasis supplied)

- Okonite represented that "the use of statistical process control and inspection procedures... so that today the Okogard cables produced by Okonite are of the highest quality and uniformity in the industry... This long, trouble free in-service record is unmatched by any other medium voltage cable system..."

- Okonite represented that it had subjected its product to "continuous testing at four (4) times rated voltage to ground (35kV), and load cycled to 90°C each and every day," and that the product had "withstood this severe testing protocol for well over 1100 days without any failure."

- Okonite represented that it had subjected its product to impulse or switching surge tests, and that the tests "severely stressed the Okoguard insulation system and did not

---

[1] All of Okonite's important pre-contract written representations were included in the Agreement as Exhibits A-I.

2

record any failures after over **4-1/2 years of accumulated testing time.**" (Emphasis in the original).

- Okonite represented that, "*One hundred percent reliability, is not a goal but a reality.*"
- Okonite represented that, "With over 25 years of service life experience in submarine applications Okoguard provides a balance of properties that include reliability, flexibility, high ampacity rating and retained dielectric strength."

NSTAR Electric relied on the representations and promises described above, all of which were set forth in Exhibits to the Agreement. Okonite's representation that it would not use field splices was particularly material to NSTAR Electric's decision to contract with Okonite. Factory splices are inherently superior to field splices because factory splices are performed in a strictly controlled environment. Because of that, NSTAR Electric specifically asked, "Will any field splices be required?" Okonite's written response was direct and to the point:

> Our proposal offers a unique and effective project installation arrangement having the following benefits:
>
> ***1 – The submarine cable will be furnished manhole to manhole without field splices.***

(Emphasis added).

On or about August 19, 1994, NSTAR Electric entered into a written agreement with Okonite ("the Agreement") for the purchase and installation of a +/- 38,000-foot submarine, land, and optical fiber cable system connecting Falmouth and Martha's Vineyard. The price was $3,122,106. Under the Agreement, Okonite was required to install the cable in accordance with best construction practices and to provide NSTAR Electric with a complete and fully operable system. Okonite was also required to install the cable using "*state of the art methods,*

3

*procedures, equipment and specifically trained personnel so that a long period (40 years) of reliable service can be expected.*" The Agreement also contained an express warranty, providing in pertinent part:

> The Contractor [Okonite] warrants to the Company [NSTAR Electric], for a ten (10) year period commencing with the Date of Acceptance ("Warranty Period"), all of the Submarine/Land/Optical Fiber Cable System ("System") from terminal to terminal, **will be free from defects in material and workmanship** provided the System is employed under conditions contemplated and covered by the design specification, and provided further that the System is maintained and operated in accordance with the Contractor's recommended standards and procedures. The Date of Acceptance shall be deemed as that date when successful final Field Acceptance Tests are completed as provided for in the Specifications.

(emphasis added).

Consistent with the importance of factory splices to NSTAR, the Cable Specification attached to the Agreement expressly provided,

> 10.0    CABLE SPLICES AND TERMINATIONS
>
> 10.1    The cable manufacturer will be responsible for all factory splices in the submarine cable system and if not actually making the splices will supply supervision to oversee and approve this work.
>
> 10.2    It is expected that the submarine cable circuit requirement shall be supplied in one continuous length *without field splices.*

Agreement, Exhibit B, Cable Specification, ¶10 (emphasis added) The Agreement further provided,

> M.    CUTTING AND PATCHING
>
> The Contractor shall be responsible for all cutting, fitting or patching of the Work that may be required to make its several parts fit together properly...

Agreement, General Terms and Conditions – Section 2, ¶M.

Okonite manufactured and installed a power cable, known as the #75 cable, pursuant to the Agreement. The #75 cable was first energized on May 16, 1995. It failed on June 22, 1995. Okonite admitted that the cable was defective. Okonite, by agreement with NSTAR Electric,

4

replaced the cable with a second cable, known as the #99 cable, with a new ten-year warranty to run from the date of the final field test on the new cable. The new ten-year warranty began to run on December 3, 1996.

The #99 cable has failed on four separate occasions. Each failure has occurred at or near one of Okonite's splices. On each occasion, thousands of NSTAR Electric customers lost power. Okonite "repaired" the cable after each failure by cutting out a factory splice and replacing it with six field splices. The last cable failure involved the failure of one of the replacement field splices. Although power was restored to the Island quickly after each failure, the #99 cable was out of service for repairs for months at a time. For example, after the November 1999 cable failure, the necessary repairs and testing were not complete until February 2000 During one of the repair periods, NSTAR lacked sufficient "firm capacity" to meet peak demand on the Island.

The cause of the cable failures is in sharp dispute. Various consultants retained by both sides have reached differing conclusions about the nature of the defects leading to cable failure. One Okonite employee opined that, "somebody must have nicked the insulation while ring-cutting and removing the original jacket" and that the nick was the cause of one of the failures. One consultant opined, "the fault may have occurred due to an electrical discontinuity in the shield assembly; perhaps due to cable assembly, in factory handling or during installation." Another consultant opined that the "defects most likely causing the cable failures are the ridges on the cable metallic shield, which deeply protrude into the extruded insulation shield and leave indents on the insulation." This consultant suggested that these ridges might have occurred because "the joint metallic shield was applied in the opposite direction of lay, as compared to the original cable shield. Such design," the consultant suggested, "could facilitate partial unwinding of copper tapes during thermo-mechanical deformations, resulting in looseness of the tapes and,

finally, in creating the ridges." The consultant ultimately concluded "the most likely reason for the in-service failures was looseness of the cable metallic shield resulting in the development of sharp ridges on the shield, harming the outer layers of the cable insulation system

In each instance of cable failure, Okonite raised the cable, cut out the affected area and spliced in a new section of cable using multiple field splices. All of the filed splicing was done on the deck of a barge in the middle of Vineyard Sound. As a result, the #99 cable, which originally had fifteen factory splices (in five groups of three), now has eight original factory splices and fifteen field splices.

## ARGUMENT

Okonite's strategy in this case has become patently clear. Confronted with discovery requests that sought documents and interrogatory answers on key issues in the case, Okonite first objected, then produced what it purported to be all documents concerning the failures, then hurriedly moved for summary judgment, and then finally moved for a stay of all discovery after being confronted with NSTAR Electric's well founded motion to compel.

It is obvious what motives Okonite; it seeks to strip NSTAR of its right under the Rules to engage in any discovery whatsoever. At the very same time, however, third-party discovery has uncovered key documents that Okonite has wrongfully held back from production.

A.   It Is Clear From Discovery To Date That Okonite Is Withholding Key Documents.

NSTAR Electric has obtained third-party documents from Simplex Wire & Cable Co. ("Simplex") that show that Okonite is withholding key documentary evidence from production. Simplex was one of Okonite's cable contractors. Simplex armored the cable and performed all of

6

the factory splicing for the cable. NSTAR obtained the documents only after filing a motion to compel against Simplex.[2]

   1.   Documents Concerning Post-Fault Dissections And Analysis

Okonite's response to NSTAR Electric's multiple document requests concerning post-failure dissections was clear and unambiguous.

> REQUEST NO. 7
>
> All documents concerning any System Failure, including documents concerning the causes or suspected causes of such failures.
>
> RESPONSE
>
> Okonite objects to this request… Without waiving these objections or any of the general objections, Okonite will [produce] … all non-privileged documents in its possession, custody or control representing the results of testing, inspection, or examination of removed splices…

Okonite's response is now demonstrably false. Simplex produced a March 24, 2000 letter from E.J. Bartolucci, an Okonite senior staff electrical engineer, to Gary LaCasse, a Simplex project manager, concerning post-failure fault dissections (Lyne Decl. ¶ 2). The document reads, in part:

> As you can see from the first picture there was a set of chatter marks on the Red phase splice. This sequence of pictures shows the chatter marks and the wrinkled tape marks transferring down to the insulation. Other than the indents the insulation was not punctured. However, it appears that something caught the cable after it was spliced.
>
> * * *
>
> Let it be known that this is just an exchange of information between Simplex and Okonite. We will not be using these pictures for any other purpose than a learning experience. Based on these pictures we should both investigate the cabling operation and the route the cable travels prior to any upcoming submarine cable projects.

---

[2] The motion was withdrawn after Simplex produced the requested documents. Simplex has yet to produce a privilege log.

(Emphasis supplied). Okonite did not produce this document to NSTAR Electric despite representing that it had produced all non-privileged documents "representing the results of testing, inspection or examination of removed splices." The document is not privileged. It is directly responsive to NSTAR's document requests. Okonite represented that it had produced all such documents. It didn't.

Okonite and Simplex exchanged information with each other (but not with NSTAR Electric) concerning the potential causes of the cable failures and then decided to keep their findings private. Mr. Bartolucci, a senior Okonite engineer, urged further investigations before Okonite and Simplex laid any more undersea cables. Okonite tried to hide the document in this lawsuit. It should be sanctioned for its willful misrepresentations to NSTAR and this Court.

2. Documents Concerning Compressive and Tensile Stress In The Cables

Simplex produced a letter from Mr. LaCasse to J.V. Fitzgerald of Okonite dated October 19, 1995, seeking a meeting "to discuss a number of technical issues regarding the remake of Martha's Vineyard #6." (Lyne Decl. ¶ 3). The document continues:

> A preliminary review of the proposed cable design indicates that the S-Z cabled 500 MCM phase conductors will be exposed to damaging stresses during coiling, unless the minimum coiling diameter is increased and the conductors are allowed to transfer stresses between adjacent right-hand and left-hand lay sections.

(Emphasis supplied). Mr. LaCasse goes on to make various design change recommendations, but continues:

> Even with these improvements, it appears that the conductors will be exposed to high levels of tensile stress in the right-hand lay cable sections and high levels of compressive stress in the left-hand lay cable sections. We strongly recommend that the conductor welds be qualified to withstand the full annealed tensile strength of the 500 MCM conductor.

(Emphasis supplied). Just as it did with the Bartolluci letter cited above, Okonite held the document back from its production. Did Okonite follow these recommendations? Does Okonite

8

have any evidence that tensile or compressive strength had anything to do with the cable failures? NSTAR Electric is in the dark without discovery.

NSTAR Electric is not seeking to engage in a fishing expedition or merely speculating about a link between compressive stress and the cable in this case. In discovery, Simplex produced what appears to be a memorandum of test results concerning the Martha's Vineyard cable dated November 2, 1995. (Lyne Decl. ¶ 4).[3] One section of the memorandum concerns the effects of compressive stress on the cable armor:

> The amount of compressive stress on the armor during coiling … is a function of coiling diameter, armor lay angle, and degree of radial constriction of the armor. If the armor is totally constricted from outward movement, one extreme exists … and compressive stress is maximum. If the armor is totally free to expand radially … then the other extreme exists and compressive stress in the armor is virtually zero. In the real case, the outer nylon sewings do have a <u>significant</u> restricting effect on the expansion of the armor [illegible] diameter during coiling.

In a footnote to the word "significant," the memorandum continues:

> note: <u>not</u> a <u>significant</u> effect in terms of adding substantial stress to cable core; overall HDPE jacket was very <u>much</u> more significant and added very high stress.

Later, the memorandum continues:

> Adjacent annealed coffin sheathes to accommodate the bending stress at the weld to some extent in [illegible] behind strands nullify the compressive/tensile forces due to bending. [Illegible] contributed to problems encountered in the previous MV (1995) manuf. was the presence of the overall HDPE jacket. This acted, to a great extent, as a very effective binder which had the effects of:
>
> > (A) preventing radial expansion of the LHL during bending over sleeves and during coiling, and
> >
> > (B) preventing necessary longitudinal adjustments of the components during bending over sleeves and during coiling. This allowed tensile stress in RHL [right-hand lay?] to [illegible] to be excessive and excessive compression in LHL [left-hand lay?].
>
> The new manufacturing (without O/A jacket) will allow much greater movement of the components to balance any bending and coiling stresses. It is very desirable that the cable <u>not be coiled to</u> less than a 20 ft. diameter. To minimize the chance of a weld break in

---

[3] The memorandum is handwritten and difficult to decipher, although its gist is clear.

coiling, it would be desirable to place known welds at as large a coiling diameter as possible (30 to 40 ft?) Welds should [illegible] have the ability to not break on a straight level at loads < full annealed 500 KCM strength.

Taken together, these documents clearly indicate: (1) that Okonite and Simplex were aware that coiling could cause damaging compressive and tensile stress in the cable; (2) that Simplex recommended certain design changes (that Okonite may or may not have made); and (3) that an internal Okonite or Simplex document dated November 1995, after the failure of the first cable in this case, suggesting that the coiling problem actually occurred.

    3.    <u>Documents Concerning Problems With Conductor Joining Techniques.</u>

NSTAR propounded the following interrogatory in November 2004:

> <u>INTERROGATORY NO. 10</u>
>
> Identify each and every instance in which an Okonite underwater (submarine) cable has failed due to its design, fabrication or installation, and for each such failure, please provide the following information:
>
>     a.    The identity of the Cable by cable name and number, cable owner and cable location;
>
>     b.    The date of failure; and
>
>     c.    The cause of failure.
>
> <u>RESPONSE</u>
>
> Okonite objects … Without in any way waiving these objections or the general objections, Okonite answers that no rubber submarine cable manufactured by Okonite has ever failed due to its design, fabrication or installation other than the cable that Okonite installed for NSTAR in 1995.

Simplex produced a letter dated October 3, 1995 from Mr. Fitzgerald to Mr. LaCasse. Just as with the Bartolluci letter, the LaCasse letter and the coiling test results, Okonite held the Fitzgerald letter back from its production. The letter, which requests a meeting concerning "factory splice designs for the MV6 project [i.e., the project at issue in this case] and future orders," reads:

> <u>The subject of conductor joining techniques</u> and the pursuit of continuous improvements in this operation are not the areas we would like to discuss <u>in light of the processing problems the submarine orders have experienced since 1990</u>. The handling and movement of these large diameter cables and their associated weight from the armoring line to the storage tanks and finally to the barge/ship should be discussed in detail. <u>A better understanding of this movement in a brainstorming session may identify corrective actions which will contribute to the success of our joint projects.</u>

(Emphasis supplied) (Lyne Decl. ¶ 5).

Not only does the letter powerfully suggest that Okonite's interrogatory response is false and misleading, the reference to problems with submarine cable joining techniques (i.e., cable splicing) since 1990 is obviously and directly relevant. Every one of the NSTAR cable failures has occurred at or near cable splices. That Okonite would fail to disclose its admittedly chronic splicing problems since 1990 smacks of the same bad faith that caused Okonite to hide other directly relevant documents from production.

    4.    <u>Documents Concerning Holes And Breaks In The Jacket</u>

Simplex produced an internal memorandum dated April 19, 1995. It reads, in relevant part:

> Martha's Vineyard Cable <u>has holes and breaks in the jacket.</u> The jacket holes will be repaired behind Armor Line 5-4, prior to armoring.

(Emphasis supplied) (Lyne Decl. ¶ 6). The memorandum goes on to prescribe a repair procedure. Okonite produced no documents that refer to or discuss that fact that it delivered a cable to Simplex for armoring that had holes and breaks in it, and no documents describing whether the repairs were effected, how Okonite determined that the repairs were sufficient, and perhaps most importantly, why Okonite's manufacturing and quality control processes allowed such a cable to leave the factory.

5.   <u>Documents Concerning Quality Control Records</u>

Simplex is an ISO 9000-compliant manufacturing facility. It produced various ISO 9000 mandated documents, including periodic audits of the Simplex quality control process and various "Corrective Action Reports." (See e.g., Lyne Decl. ¶ 7). Corrective Action Reports are created after any manufacturing event that gives rise to quality control problems. Corrective Action Reports are mandated by ISO. Okonite is an ISO 9000-compliant firm. It must have such documents. Because the documents, by their nature, relate to actions Okonite took in response to actual quality control problems, any such reports would be directly relevant. Okonite's blanket refusal to produce any of its ISO-mandated quality control documentation smacks of bad faith.

B.   <u>The Fact That NSTAR Electric Has Some Information In Its Possession Is No Grounds For Denying Discovery.</u>

Okonite makes an argument that is completely at odds with the liberal philosophy of discovery: since NSTAR Electric has <u>some</u> information regarding the causes of the cable failures, it is not entitled to discovery of whatever <u>other</u> information Okonite might have. (Mem. at 5-6). Okonite cites no authority for this absurd argument. NSTAR Electric is plainly entitled to discovery of information regarding the causes of the failures for two reasons: first, proof that the cause was related to a defect is one of the elements of NSTAR Electric's breach of warranty claim. Second, Okonite's knowledge of cable problems is relevant to Okonite's knowledge of the reliability or unreliability of its cable and thus relevant to NSTAR Electric's misrepresentation claims.

C.   <u>A Stay Is Unwarranted Here.</u>

Okonite raises two principal arguments to justify its blanket effort to cut off NSTAR from its right to pursue discovery: first, it may prevail on its motion for summary judgment; and

second, NSTAR Electric "has not provided any facts to justify the discovery it seeks." (Mem. at 16-17).

       1.       The Pendency Of The Summary Judgment Motion Is Not Dispositive.

In complex litigation, summary judgment motions or other dispositive motions are hardly unusual. And, as Okonite argues, courts do have discretion, in appropriate cases, to stay discovery pending a resolution of a dispositive issue through motion practice. But this discretion is salutary only when "applied sparingly and with real discretion rather than as an absolute rule." 8 Charles A. Wright et al., Federal Practice & Procedure § 2040 (2d ed. 1994). There is nothing in particular about this case that suggests a stay is appropriate. Indeed, by Okonite's argument, any defendant could call a halt to discovery by filing a motion that, on its face, is dispositive.

First, this is not a case where there is a single dispositive issue. Even if Okonite were to prevail on summary judgment on the warranty claim, the misrepresentation claims would remain. This is not a case where the motion for summary judgment presents a discrete threshold issue such as subject matter jurisdiction, see Feliciano v. DuBois, 846 F.Supp. 1033, 1042-43 (D. Mass. 1994) (dictum), or immunity from suit, see Moore v. Busby, 92 Fed. Appx. 699, 702 (10th Cir. 2004), nor is this a case where the pending motion for summary judgment presents solely legal, as opposed to factual, issues, see Cassidy v. Millers Cas. Ins. Co. of Tex., 1 F.Supp.2d 1200, 1214-15 (D. Colo. 1998). In short, there is nothing special about this case that would make it appropriate to stay discovery.

Second, Okonite's argument ignores NSTAR Electric's arguments under Rule 56(f) in its opposition to the motion for summary judgment: NSTAR Electric cannot respond in full detail to the motion for summary judgment without evidence concerning causation. True, NSTAR Electric has now obtained some documentary evidence from Simplex, which it did not have when it opposed the motion for summary judgment. But Simplex's documents raise more

questions than they answer, but in any event, give ample reason to believe that Okonite was both aware of problems with its undersea cables, and is using motion practice in an attempt to bury that knowledge.

    2.    <u>NSTAR Electric Has Amply Justified Its Need For Discovery.</u>

Okonite argues that NSTAR Electric has not provided enough of a factual justification for the discovery it seeks. Okonite's argument is wrong as a matter of law. Here, the principal allegation, which is undisputed, is that an undersea cable NSTAR Electric purchased from Okonite has failed several times in a matter of a few years. NSTAR Electric's first claim is for breach of warranty. Causation of the failures is an element of breach of warranty. By alleging the failures, which are undisputed, NSTAR Electric has provided all the factual basis necessary to conduct discovery into causation. NSTAR Electric has also alleged that Okonite misled it regarding the reliability of its product. The Simplex documents noted above, which strongly suggest Okonite and Simplex knew about earlier failures and problems with the cable, provide an ample factual basis for further discovery into whether the cable was in fact defective, and whether Okonite knew it.

<u>Lunkenheimer v. Federal Deposit Ins. Corp.</u>, 1992 WL 142033 (D. Mass. Jun. 10, 1992), an unpublished and cursory opinion, is not to the contrary. Okonite believes it has a legal defense to the breach of warranty claim, namely that the warranty did not fail of its essential purpose and thus that Okonite is entitled to go on repairing the cable no matter how many times it fails. But this does not bear at all on the question whether NSTAR Electric has provided enough facts to show that further discovery on causation is needed. Despite Okonite's serial misrepresentations in the discovery to date, NSTAR Electric has uncovered documents on causation that prove that further discovery into causation would not be a merely speculative exercise. Contrast <u>Lunkenheimer</u>, where the non-moving party sought discovery based on a mere <u>belief</u> that a

certain document might exist. Indeed, in a case where the failure of a product is so clear, to suggest, as Okonite does (Mem. at 18 n.10), that NSTAR Electric has somehow violated Rule 11 in its Complaint is laughable.

## CONCLUSION

For the foregoing reasons, NSTAR Electric respectfully requests that Okonite's motion to stay discovery be denied, that the costs and attorney's fees incurred in opposing the motion be awarded to NSTAR, and that, as a further sanction for Okonite's discovery abuses to date, all of Okonite's objections to NSTAR's discovery requests, other than on privilege grounds, be ordered stricken by the Court.

Respectfully submitted,

COMMONWEALTH ELECTRIC CO.,
d/b/a NSTAR Electric
By its attorneys:

Daniel J. Lyne (BBO No. 309290)
Theodore J. Folkman (BBO No. 647642)

HANIFY & KING
Professional Corporation
One Beacon Street
Boston, Mass. 02108
(617) 423-0400

Dated: June 2, 2005

I HEREBY CERTIFY THAT A TRUE COPY OF THE ABOVE DOCUMENT WAS SERVED UPON THE ATTORNEY OF RECORD FOR EACH OTHER PARTY BY MAIL-HAND ON 6/2/05